Argued April 22; affirmed May 1, 1930

# STATE *v.* DELAPLAIN

(287 P. 681)

628

*Glen R. Metsker* of St. Helens for appellant.

*John L. Foote,* District Attorney, of St. Helens for the State.

BROWN, J. We shall first treat the assignment of error involving the court's denial of defendant's motion for a directed verdict of not guilty on the ground of absence of proof. This necessitates a careful review of the testimony of record.

On April 8, 1929, the sheriff of Columbia county and his deputy, accompanied by F. E. Dodele, a state prohibition officer, and Dave F. Tow and M. T. Burnett, federal prohibition officers, duly armed with a search warrant entered upon the premises of the defendant consisting of a farm of about 160 acres situate on the Nehalem river in Columbia county, Oregon, and upon which the defendant resided.

With respect to the buildings where the distillery is alleged to have been situate, Robert Calhoun, the deputy sheriff, said:

"The building, I should judge, was 40 feet long and 20 feet wide where the chickens were. \* \* \* It was partitioned off on the back end of the chicken house about 10 feet wide and the length of the chicken house and another 'L' on the south side. As I walked into it,

\* \* \* two men stood there inside of the small room and asked me what I wanted. Mr. Delaplain was the one who asked me what I wanted and who I was. Then I showed my credentials, \* \* \* and told him I wanted to investigate the place \* \* \*. As we stepped inside, Mr. Delaplain was stripped down for work in his undershirt and overalls, \* \* \* and he said, 'Well, I guess I better turn the burner off.' And about that time \* \* \* Dodele came in the door and said, 'Let it run, I want to see it in operation.' And Mr. Delaplain said, 'I haven't had it burning very long. It will probably be an hour before it starts to perk.' As he (Delaplain) stepped aside, the still was there with a quantity of gallon jugs, \* \* \* probably a dozen or more gallon jugs there, and the still complete was there with the burner going, with the pressure tank on it. And after investigating we stepped back into another room through a doorway, and there was 15 vats of about 150-gallon capacity each. Fourteen of them were full of mash, 13 were full and one had a little taken out, and the other was empty. The still was full of mash. \* \* \* Where the still was set up and coil attached, there was a complete plant like we found them in more than one instance. \* \* \* There was a barrel containing probably, we estimated, about 25 gallons of liquor in the barrel.

"Q. About how far was this chicken house \* \* \* from the house? A. I should judge about 75 or 80 yards."

Witness testified that the capacity of the still was about 150 gallons; that there was no liquor flowing from the still at the time it was discovered, and that defendant said it would be an hour before it would be operating; that there were two burners under the still, only one of which was burning; that there was "fire coming from one burner when I was there," and that the defendant said "he was having trouble with the other burner."

Oscar G. Weed, sheriff, in corroboration of the testimony of his deputy, said:

"As we went in, the first part had the chickens in * * * and another part of the building contained a still, with all equipment, completely set up. Then in the back part of the building was another room containing the 15 vats—13 of them completely full of mash, and one partly full, and the other empty."

He testified that there was in the building a barrel containing about 25 gallons of moonshine, also a number of glass containers, and some empty kegs; that in a nearby tool house they found a large number of empty pint bottles, gallon glass containers, about 4,000 corks, a quantity of yeast and a number of sacks of sugar, and 35 gallons of moonshine put up in quart bottles.

F. E. Dodele, a state prohibition officer at the time of the arrest of defendant, testified that he had examined many stills and that he was acquainted with the manner in which they are operated. He testified that, upon the occasion of the search of the defendant's premises and his arrest, he (witness) walked around one side of the chicken house while Deputy Sheriff Calhoun was going in the door; that "when we were inside we went into the still room and found the burner was going under the still in the back end of the place." He testified that the still was a complete still, with a capacity of about 150 gallons. He corroborated the testimony of Calhoun as to the number of vats containing mash, and also stated that they found in that room 25 gallons of moonshine whisky. In addition, he said that there was in the room a 50-gallon barrel of malt and some coal oil; that there were two burners under the still, one of which was not burning; that the one burner would operate the still, but that "it would take a little

longer to heat it up." He testified that the defendant said he was having trouble with the other burner, and "I heard this man (defendant) say in the presence of the deputy sheriff and myself that he was the owner of this outfit, and this other man (the defendant's son-in-law) had just come in." In describing the still to the jury he testified that it was a very simple type, a common type; that it was operated with a pressure burner; that most any one could set it up if they possessed the parts. Continuing, he said:

"There is nothing to it other than the dome and coil, and there is only one way they would fit, and the pressure burner is filled with oil or gasoline and pumped. There is a small tube from there to the burner. That forces a gas mixed with air to the burner. That burner is lit under the still, and that is all there is to it. The still is filled with mash, and, after heating, steam arises, goes through the dome and around this coil into a condenser or container that holds water and than changes into liquor."

He testified that at the time of the investigation the mash was hot in the still; that the still was complete for the purpose of manufacturing intoxicating liquor, and that it had manufactured liquor; the latter statement being based upon the fact that there was liquor in the coil when it was torn down. He testified:

"When I first went in Delaplain was there, and he said, 'You might as well shut her off.' I was going to let her run a little longer, but he said it would take about an hour before it would start to perk as I recall.

"Q. Start to perk, huh? A. Yes. That is a common word used among moonshiners."

■■ There is evidence on the case that fairly tends to show guilt on the part of the defendant as charged in the indictment. Under such circumstances it is the duty

of the court to submit to the jury the question of guilt or innocence: *State v. Jones,* 18 Or. 256 (22 P. 840); *State v. Pomeroy,* 30 Or. 16 (46 P. 797). See, also, *State v. Marastoni,* 85 Or. 37 (165 P. 1177). In the instant case the defendant was in possession of his farm with the buildings situate thereon, and he was present and operating the still in the chicken house at the very moment he was arrested. The jury had a right to infer that such operation was carried on for the purpose of manufacturing intoxicating liquors for beverage purposes. Clearly the court did not err in overruling the defendant's motion to direct a verdict of not guilty.

■ The defendant claims he is a victim of circumstances. He takes exception to the court's ruling and instructions on the question of the accomplicity of defendant in the setting up and operation of the still. It will be useful therefore to examine the testimony of defendant arising out of his transactions had with the two mysterious characters known to him as "Tony" and "Joe." Briefly summarized, this testimony is about as follows:

Defendant was born in Kansas 51 years prior to the date of trial. He had lived in Oregon a little over three years "the last time," having come here from Porterville, California, where he lived for about five years. His occupation while in Kansas was mostly farming, and in California he "kept" a store near Porterville. On coming to Oregon he resided at Salem for a month, then he bought a farm in Columbia county and engaged in dairying. He later sold this property and bought the Smith place located on the Nehalem river. He testified, among other things, that prior to this occasion he had "never been arrested for anything" in his life; that he had nothing to do with setting

up the distillery found on his place, nor anything to do with its operation, "only what I was fooling with that day (the day of his arrest)." He testified, in effect, that he knew who owned the outfit and set it up, but did not know their full names. He said, "They called each other Tony and Joe. They looked like Austrians. They never gave me their names." Concerning the conversations which resulted in his leasing the chicken house to the two men, he testified:

"They ('Tony' and 'Joe') came out to my place about a month before this, stopped a minute and asked me if that place was for sale and I told them 'No.' They talked a while and then left. They came back twice more after that and wanted to rent the place and I told them 'No,' and they came back a little later and offered to rent * * * some of the place. They said they wanted to move on the place and do some work there. I talked a while with them and found out what they wanted it for and told them 'Nothing doing.' They went away and came back that afternoon and talked about it some more, and that time I got the money and rented them that house.

"Q. Did they make you an offer? A. Not until that evening. Then that evening they told me what they were, and said they wouldn't cause me any trouble, and I finally took them up. They offered me $100 a month for the building and thought they would be there a month.

"Q. They paid you the $100? A. Yes, sir."

He testified that the still was almost set up before he saw it. On being asked whether he saw "these fellows" on the place after they first started to set the still up, he said:

"I seen them several times; a number of times. * * * Pretty near always they came in the night, and left the same way."

He testified that the mash and sugar, corn and yeast and liquor found upon the premises belonged to "these fellows, I suppose." He said it wasn't his, and that he had nothing to do with it at all. As to the date on which "Tony" and "Joe" left, he said:

"Q. With reference to the date of this arrest, how long before that had these Austrians been there? A. One had left two days before. This happened on the 8th, which came on Monday, I think. It was Saturday morning that they both were there early, and one left and the other stayed until I think Sunday morning or Saturday night. I don't remember exactly when he left.

&ast;  &ast;  &ast;  &ast;  &ast;

"Q. Now, tell the jury what was going on there and what you were doing on the day of this arrest on the 8th day of April. A. These fellows hadn't been around there that day, and my son-in-law &ast; &ast; &ast; had come to my place. He had been sick for some time and wasn't working. He went over with me to the place the afternoon before. I knew what was going on at the building, and we had went down there a little while before the officers came. I was trying to see if I could get the still in operation. The mash was already in the can or still.

&ast;  &ast;  &ast;  &ast;  &ast;

"Q. Did you make any change or alterations in the still equipment? A. I pumped up the pressure tank and tried to get the fire started.

&ast;  &ast;  &ast;  &ast;  &ast;

"Q. What was your idea in operating it? A. Just for pastime. To see if I could do it.

"Q. Just fool curiosity. Did you—what did you do then. A. I had one fire going under it. I noticed that when they had the still operating they got a lot of noise but mine didn't.

"Q. Did you make any effort to light the other burner? A. Yes, but it didn't go. I didn't know what was the matter.

"Q. While you were there did the thing work? Did you get any liquor from it? * * * A. No, there was nothing running from it at all."

He testified that he did not know how to set up a still, and knew nothing about mixing mash; that he never used intoxicating liquor himself, and that neither the still nor mash nor containers were his property. He stated that the fire under the still had been burning only fifteen or twenty minutes when the officers arrived; that he heard Mr. Dodele testify as to the manner in which the still was set up, and that that "gave a very good idea of the way it was set, as far as I remember." On cross-examination he reiterated his testimony in relation to "Joe" and "Tony." With reference to the final agreement with them, he said:

"They finally offered to give me the money and get to work on it. * * * They gave me the money and wanted to get to work on it. I knew what they wanted to do now. * * * They were to rent the building, * * * chicken house (in which the still was found). * * * They told me that they would be there a month, and gave me $100.

* * * * *

"Q. What did they tell you they wanted the use of the chicken house for? A. They told me that evening that they wanted to use it for a still. * * * They said they wanted to make liquor there.

"Q. And you understood at that time you rented it to them that they were coming in there to make liquor? A. Yes.

"Q. That was agreed? A. Yes. * * * They said they were from Portland * * *. They didn't tell me, but I heard them call each other Tony and Joe."

He testified that they moved the stuff in immediately after renting the place. He said that, on account of the steepness of the hill they couldn't reach the

chicken house with a truck or car, and for this reason they used a sled that was on the place when defendant purchased it. He said he had been in the chicken house before the day of his arrest, but that he had not been in the still room until that day. As to the procedure of the two men in carrying on their operations, he testified:

"Q. What did they do with the mash, if they had any, after it had been used in the still? Do you know? A. No, I don't know what they done with that. I have seen them bury corn in the ground.

"Q. Very much? A. They would bring out a bucketful a day and bury it in a hole.

\*   \*   \*   \*   \*

"Q. And as I understand you they used a sled sometimes? A. Yes.

"Q. How did they pull the sled down there? A. With a horse.

"Q. Whose horse? A. They used a horse of mine part of the time.

"Q. Did they come and ask you for it? A. No. They didn't have to if it was there.

"Q. You were perfectly willing that they would do that? A. I didn't cause any trouble."

Under the law of this state defining parties to crime, it is provided:

"All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the crime, or aid and abet in its commission, though not present, are principals, and to be tried and punished as such"; Or. L., § 2370.

In the cause at issue, the defendant testified, in substance, that in consideration of $100 paid to him by two strangers known as "Tony" and "Joe" he leased to them his chicken house for one month for the purpose of housing and operating a distillery for the manufacture of intoxicating liquor. He further testified that

in the transportation of the still and supplies to the chicken house defendant's sled and horse were pressed into the service of the lessees. To the mind of the writer it is manifest that, if, indeed, the mysterious persons described by defendant actually existed, the defendant is an accomplice in their unlawful acts in the setting up of the still and the manufacture of liquor, and he is not in position to assert that the court should not have charged the jury in the matter of his accomplicity in the commission of the unlawful acts charged.

The question of the accomplicity of a defendant was presented in the case of *State v. Wilson*, 127 Or. 294 (271 P. 742). In a review of that case, we wrote:

"Neither the purchase of the sugar and corn alone, nor the transportation of sugar and corn from Juntura to the still, nor the defendant's mere presence at the distillery, would constitute a criminal offense. But such purchase and transportation to the still, with a knowledge and intent that the articles purchased shall be used for a criminal purpose, does constitute a crime, and that was the jury's understanding of the instruction."

In the case at bar, there is no question concerning the defendant's knowledge. He testifies that he knew the use to which his tenants desired to put the chicken house when he rented it to them; that he stood by while they used his horse and sled in the transportation of their goods designed for unlawful purposes, and was found and arrested while in the operation of the distillery.

The defendant takes exception to the observations of the court as to the admissibility of the testimony of F. E. Dodele, who, since June 1, 1928, has been an employee of the federal prohibition department. Without any objection upon the part of the state, the defen-

dant inquired into the matter of salary and expenses received by this witness from the government. The defendant said, however, that the court's interference, ruling and comments concerning this testimony destroyed its value before the jury. We have given this matter careful consideration and are satisfied that the record discloses no reversible error of the court in ruling upon the admissibility of the testimony of this witness.

■ The defendant asserts that the court erred in thus instructing the jury with relation to the date prescribed in the indictment:

"The date that is stated in the charge when he is accused of this crime is April 8, 1929. However, you are instructed that any violation of a criminal statute that may have been committed up to that date and within the past * * * three years would be such that you could base a verdict of guilty upon it. In other words, it is not necessary that the state prove that this still was set up on April 8, 1929, to support a verdict of guilty, if it is proven to your satisfaction beyond a reasonable doubt that the defendant set up a still at a prior date and within three years of the date charged in the indictment. If such was proven to your satisfaction, that would be sufficient to support a verdict of setting up and operating a still."

The testimony shows that the still was discovered by the officers on April 8, 1929, but it is apparent that it had been set up and in operation for some days previous to that time. What the court intended by the above instruction is in compliance with § 1443, Or. L., which provides:

"The precise time at which the crime was committed need not be stated in the indictment, but it may be alleged to have been committed at any time before the

finding thereof, and within the time in which an action may be commenced therefor, except where the time is a material ingredient in the crime."

See *State v. Wilson*, supra.

In view of the charge of the court in its entirety, there is no merit in the assignment last above noted; for it is manifest that the jury understood that the still referred to was the still described in the indictment.

■ Exception is saved to the following instruction:

"As I understand the testimony in this case, I don't recall as to whether there is any disputed or contradicted testimony except as to the answer made by defendant. The testimony of the other witnesses does not contradict—the testimony of the other witnesses do not contradict each other in any other respect. If I am wrong on that connection I would like to have counsel call my attention to it. That is the way the matter . appears to me."

Counsel remained silent.

The deputy sheriff first testified on behalf of the state. He was corroborated by the sheriff, whose testimony covered the same ground, and, again, by F. E. Dodele, whose testimony is substantially the same as that of the other two. Dave F. Tow, of the federal prohibition department, was called to the stand, and it was stipulated that his testimony would be practically accumulative of the testimony of the preceding witnesses. M. P. Burnett, another federal prohibition officer, was then called and it was likewise agreed that his testimony would be substantially the same as that of the others. There was but little contradictory testimony given at the trial. We conclude, therefore, that the objection to the foregoing instruction is not well taken.

Section 9 of chapter 30, General Laws of Oregon, 1923, is as follows:

"Any mash, wort, wash or distillery found in any house or on any premises or within any inclosure shall in the case of the mash, wort or wash be deemed *prima facie* to have been made and fermented by, and in the case of a distillery shall be deemed *prima facie* to have been set up by, and to be the property of, the person who is in possession of such house, premises or inclosure."

■ In instructing the jury as to the meaning of this provision, the court said:

"In other words, where a distillery is found set up on a party's premises of that sort, it is deemed *prima facie* to be the property—to be set up by the person who is in possession of those premises, and that *prima facie* evidence must be considered as part of the evidence in this case, as the statute so provides."

The defendant says the court erred in failing to define the term *"prima facie,"* as used in this instruction. With respect to this contention, we direct attention to the following excerpt from 16 C. J., 1057:

"A failure to define or to explain terms used in a charge is not error, in the absence of a request for such an instruction."

In *Thompson v. State,* 26 Okl. Cr. 121 (222 P. 568), the same question was presented; and in its consideration thereof the court thus stated its views:

"No request was made by counsel for plaintiff in error that the court define this term. In the absence of such request, the charge as a whole fairly covering the law of the case, we do not think this, of itself, a sufficient reason for reversing the judgment."

We have read and considered all assignments of error. The defendant's rights have been carefully safe-

guarded by able and painstaking counsel. While some of the instructions given by the court might have been stated with greater accuracy, there has been committed no substantial error affecting the rights of the defendant.

In view of the mass of inculpatory testimony pointing to the guilt of the defendant, it is the opinion of the writer that the jury but performed its plain duty in finding a verdict of guilty.

This cause should be affirmed. It is so ordered.

BEAN, BELT and RAND, JJ., concur.