Argued March 2, affirmed April 20, 1960

# STATE OF OREGON *v.* JACKSON
351 P. 2d 439

*Robert M. Redding,* Klamath Falls, argued the cause for appellant. With him on the brief was Glenn D. Ramirez, Klamath Falls.

*O. W. Goakey,* Deputy District Attorney of Klamath County, Klamath Falls, argued the cause for respondent. With him on the brief was Arthur A. Beddoe, District Attorney of Klamath County, Klamath Falls.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY and HARRIS, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Phillip Duane Jackson, from a judgment of the circuit court which found him guilty of the crime of assault and battery while unarmed. The crime is defined in ORS 163.260. The judgment sentenced the defendant to serve a term of 30 days in the county jail and pay a fine of $250. The entry of the judgement was preceded by the return of the verdict of a jury which had found the defendant guilty. Prior to his conviction in the circuit court the defendant had met with a similar outcome upon his trial in the district court.

The complaining witness, Alberto Sapiens, was 64 years old at the time of the alleged assault. The defendant is much younger, apparently in his early twenties. Sapiens is of Mexican descent and, although a resident of the United States for many years, is unable to speak the English language fluently. An interpreter was employed at the trial.

After leaving his employment for the day on May 9, 1959, Sapiens went to the Dairy Tavern in Dairy, Oregon, where he arrived at 8:00 p.m. He remained in that place for an hour and a half, playing shuffleboard and drinking beer. He then drove, so he testified, to Nellie's Tavern in Bonanza where he met the defendant and the defendant's uncle, Nathan Copperfield. Sapiens and the defendant had known each other for several years. The three remained in the tavern for about two hours until closing time at 1:00 a.m. The evidence indicates that all three were somewhat intoxicated. At the defendant's suggestion, Sapiens then drove them to Copperfield's home where the defendant also lived. Two houses stand on the Copperfield property—one of them is occupied by Bernadine Dickens, who is described in appellant's brief as Mrs. Copperfield's niece.

Rousing Miss Dickens, the parties entered her house where they sat about, talking and drinking. It was at this point, according to Sapiens, that the assault took place. In the following testimony given through the interpreter the pronoun "him" generally refers to Sapiens:

"Q I see. Now, what happened after you arrived at the house, if anything?

"A He said they got home and start talking, then he started to make them push-ups.

"Q Who started to?

"A Jackson did.

"Q The defendant Phillip Jackson?

"A Yes, Jackson did.

"Q And what happened after he started doing the push-ups?

"A Well, he bet him one dollar he wouldn't do it twelve times. Then he did it. Then he pay him the dollar. Then Jackson says—no, he says, Alberto says, 'You are the champion.' He says, 'Yes, I am the champion.' Then he started up, he says, 'I am the champion,' then he hit him one, and he hit him twice.

"Q Who hit?

"A Jackson did.

"Q What did he hit him with?

"A His hands.

"Q Were his fists doubled up?

"A Yes. He hit him twice.

"Q What happened then?

"A Well, he knock him down, he started kicking him one.

"Q Who knocked whom down?

"A Phillip—Jackson knocked him down.

"Q And then what did Mr. Jackson do to you after he knocked you down?

"A He started kicking him, he got him down.

"Q And what was he kicking you with?
"A With his shoes, his feet. He say he kick him, then he jump on his stomach twice."

This testimony is not uncontradicted. Both Nathan Copperfield and Bernadine Dickens, as witnesses for the defendant, testified that no assault occurred.

■■ According to Sapiens, the defendant relented and the witness went to his automobile and started for home. The defendant offered to drive, but for one reason or another did not do so. Suffering pain from the blows received, Sapiens started for a physician in Klamath Falls, but was unable to drive that far and went instead to the residence of Deputy Sheriff Robert F. Hartley. As a result of his injuries, Sapiens was confined to a hospital for six days. On May 18, 1959, he signed the complaint on which this prosecution was based. Sapiens admitted on cross examination that he filed the complaint because he had lost his employment and needed money to pay his hospital bills. His motive, however, is no defense for the defendant in the criminal charge. Unless perjury or fraud is proved, a prosecution can never be deemed malicious where conviction results, even though the judgment should be reversed on appeal. *Fones v. Murdock*, (1916) 80 Or 340, 157 P 148.

The defendant presents three assignments of error. First, he contends that the trial judge erred in denying a motion for mistrial raised after testimony was introduced that the defendant's attorney, Mr. Glenn Ramirez, offered to compromise the case by telling Sapiens that the defendant would pay part of his hospital bill if the prosecution were withdrawn.

An examination of this contention requires a review of circumstances which prompted the motion for mistrial. The testimony concerning the offer of com-

promise was elicited from Sapiens upon redirect examination by the district attorney. Earlier, during his cross examination, the defendant's attorney asked Sapiens several questions directed at finding out whether the witness had "talked to anybody about the case," apparently in an attempt to show that Sapiens had signed the complaint unwillingly or was prompted by improper motives. Sapiens repeatedly denied that he had discussed the case with anyone except the district attorney. The defense immediately thereafter concluded its examination and the prosecutor proceeded to ask the following questions:

"Q Now, Mr. Sapiens, after the trial downstairs in this case, did you discuss this case with Mr. Ramirez?

"THE INTERPRETER: Today?

"MR. BEDDOE: No, after the trial downstairs.
"A Last week he did.

"Q And was the defendant present at that time?
"A Yes.

"Q And did Mr. Ramirez make you any offer on behalf of Mr. Jackson at that time?

"MR. RAMIREZ: If the court please, I object to that as we're too far afield, and I don't see where that is proper re-direct examination.

"MR. BEDDOE: They went into the matter of discussing this case with various people your Honor.

"MR. RAMIREZ: And he denied he had discussed it with anybody except the District Attorney and that was it. Now this is re-direct.

"THE COURT: If he discussed the case with anyone else he should tell it, because that question was asked him on cross-examination.

"MR. RAMIREZ: He has answered he has. Going any further I can say will merely prolong the trial.

"THE COURT: I think you're entitled to go further on that matter. Read that last question again.

"(Thereupon the last question was read).

"A Yes, he told him he might help him to pay that hospital bill.

"MR. BEDDOE: I have no further questions."

Although counsel for the defendant must have known what the nature of Sapiens' testimony as to the conversation would be, he did not object to its introduction on the ground that it was inherently inadmissible, but simply that it carried the examination "too far afield." Similarly, when the testimony had been introduced, he did not at once move to strike or make a motion for mistrial. Instead, he began a recross examination of Sapiens and elicited from him the information that the defendant was not present when the offer of compromise was made. It will be noted that in response to the district attorney's questions Sapiens stated that the defendant was present. When the district attorney learned from this examination that the defendant was not connected with the offer of compromise, he at once moved that the testimony relating to the offer be stricken. The court on its own motion thereupon asked the witness several questions to clarify the matter, and when it appeared from the answers that the defendant had no part in the offer it allowed the district attorney's motion to strike. The defendant joined this motion but also moved for a mistrial which was denied. However, the court immediately charged the jury, in the following language, to disregard the evidence of compromise:

"* * * The Court is going to instruct the jury right now that any testimony relative to the conversation between Mr. Ramirez and this witness is

stricken and you are instructed to disregard it, and to pay no more heed to those statements. You are not to consider them; you are not to think about them again. Can you do that? All right."

■ Upon this state of the record, we are convinced that the trial judge acted within the bounds of his discretion in denying the motion for a mistrial. The defendant does not take the position in this court that an offer of compromise is, per se, inadmissible evidence in a misdemeanor trial. He could not well do so, having made no proper objection on this ground in the trial court. However, we do not wish to imply by anything said in this decision that we consider such evidence competent, for in our opinion it clearly is not. The crime charged against the defendant is one which our statutes allow to be compromised. ORS 134.010, 134.020, 134.030, 134.040. In the absence of statute, courts are divided upon whether evidence of attempted compromise in criminal proceedings may be offered against the defendant. See 2 Wharton, Criminal Evidence (12th ed) § 413, p 171. We have held, with the majority of jurisdictions, that it is not error to admit evidence of attempted compromise in a prosecution for a felony. *State v. Miller*, (1930) 133 Or 256, 289 P 1063. But we would greatly limit the efficacy of the statutes which permit out-of-court settlement of misdemeanor charges were we to approve a rule here which would make negotiations aimed at accomplishing the legally encouraged result competent as admissions of guilt.

■ The compromise offer was incompetent for another reason since it was not shown to have been made with the consent of the defendant. Admissions of an agent are not available against a defendant in a criminal proceeding unless shown to have been authorized by him. *State v. Rader*, (1919) 94 Or 432, 186 P 79; *State*

*v. Day*, (1892) 22 Or 160, 29 P 352. The fact that it is the defendant's attorney who makes the admission does not obviate the necessity of connecting it. An attorney has no authority, absent his client's express or implied consent, to compromise the client's case. *Hill v. Wilson*, (1926) 119 Or 636, 250 P 840; *Seaweard v. DeArmond*, (1921) 101 Or 30, 198 P 916; *Fleishman v. Meyer*, (1905) 46 Or 267, 80 P 209; Annotation, 66 ALR 107. Even if such authority existed, it would be a power conferred by law to expedite litigation without regard for the client's wishes. The usefulness of admissions in a criminal trial is to throw light on the mental state of the accused. An attorney's unauthorized statements have no relevance on this score, constitute highly prejudicial evidence and are inadmissible. *State v. Stone*, (1924) 111 Or 227, 226 P 430; *State v. Edins*, (1920) 25 NM 680, 187 P 545, 8 ALR 1331; *Satterfield v. State*, (1925) 31 Okla Crim Rep 309, 238 P 868; 2 Wharton Criminal Evidence, (12th ed) § 415, p 174.

██ The district attorney offered the evidence in good faith, since he tried the case on the theory that the testimony was admissible, and since he was under the impression, gathered from Sapiens' answers on re-direct examination, that the defendant was present when the offer of compromise was broached. As soon as it appeared that this was not in fact the case, the district attorney himself moved to withdraw the evidence from the jury and the trial court instructed the jury in strong language to disregard the evidence. The court probably would have been justified in granting a mistrial, but it was not error to refuse the motion under the circumstances presented here. While this court has held that the effect of prejudicial testimony can not always be cured by instructing the jury to disregard it, *State v. Rader*, (1912) 62 Or 37, 124 P 195;

*State v. McLennan*, (1917) 82 Or 621, 162 P 838, it has also been said that the matter rests within the trial court's discretion, *State v. Morrow*, (1938) 158 Or 412, 75 P2d 737, 76 P2d 971, and as a matter of practice a conviction will rarely be reversed if a curative instruction is given. This is true even in capital cases. *State v. Folkes*, (1944) 174 Or 568, 150 P2d 17, cert den. (1944) 323 US 779, 65 S Ct 189, 89 L Ed 622; *State v. Dennis*, (1945) 177 Or 73, 159 P2d 838, 161 P2d 670; *State v. Shull*, (1929) 131 Or 224, 282 P 237, 71 ALR 1498; *State v. Cunningham*, (1944) 173 Or 25, 144 P2d 303.

While each case must be considered on its own merits to determine whether prejudice has occurred, *State v. McLennan*, supra, is worth noting here. This was a larceny prosecution in which a witness was permitted to testify that the defendant had expressed a desire to "settle out of court." The testimony was stricken and the trial judge commanded the jury to disregard it; nevertheless, it was argued on appeal that reversible error had been committed. This court construed the testimony as not amounting to an offer of compromise by the defendant, but recognized that the jury might so regard it. The assignment of error was dismissed for the reason that the trial judge had promptly and firmly ordered the jury to disregard the testimony, but the opinion concluded with a warning that:

> "Prosecuting attorneys should not be swift to get improper testimony before the jury, lest a formal withdrawal of it afterwards fail to prevent a reversal of the ensuing conviction."

We are convinced that the trial court acted within its discretion in refusing the motion for a mistrial. The first assignment of error must be overruled.

■ For his next assignment of error, defendant contends that certain instructions given by the trial court were contradictory and hence prejudicial. At the defendant's request, an instruction on "alibi" was given since it was his theory of the case that Sapiens suffered his injuries after leaving the Copperfield residence. The trial court instructed the jury on the meaning of alibi and further instructed them:

> "If, after a careful consideration of all of the evidence, you have a reasonable doubt whether or not the defendant was present at the time the crime was committed, you should return a verdict of Not Guilty."

Further along in its charge, the trial court gave a standard instruction on the statute of limitations, as follows:

> "* * * it is not necessary to prove that the crime, if any, was committed on the exact date alleged in the indictment, but it is sufficient in that connection if the State of Oregon shall establish to your satisfaction, beyond a reasonable doubt, that such crime, if any, was committed at any time within two years prior to May 10, 1959."

This instruction conforms to ORS 132.610 which renders allegations of time in an indictment immaterial if the crime is alleged to have been committed within the statutory period of limitation. It is the defendant's contention that the instruction on alibi made the date material, and that the further instruction undermined his defense and permitted "speculation."

This contention is without merit. The instruction on time of offense was not erroneous nor did it contradict the instruction on alibi. A defendant in a criminal proceeding can not make time a material element by a defense of alibi. The precise objection which defend-

ant raises here was considered in *State v. Goddard*, (1914) 69 Or 73, 133 P 90, 138 P 243, Ann Cas 1916A 146, and rejected. Also see *State v. Poole*, (1939) 161 Or 481, 90 P2d 472; *State v. Delaplain*, (1930) 132 Or 627, 287 P 681; *State v. Eggleston*, (1904) 45 Or 346, 77 P 738. The testimony in this case, on both sides, was directed at proving or disproving the fact of an assault and battery which did or did not occur in a specific manner well understood by all of the witnesses. Plaintiff's witnesses were not discussing a state of affairs which existed on night "A" and defendant's witnesses another state of affairs which existed on night "B". It is incredible that the jurors should have supposed this was the case, or that the instructions should have misled them in any way. The jury well understood that its duty was simply that of crediting one witness and of disbelieving another in the face of conflicting versions of the truth.

 Finally, the defendant assigns as error the trial court's refusal to direct a verdict of not guilty, on the theory that the evidence was insufficient to sustain a conviction. The prosecution based its case on the testimony of two witnesses, the complainant Sapiens and Deputy Sheriff Robert F. Hartley, to whose home Sapiens went after the assault. It is unfortunate that Sapiens' testimony had to be reported to the jury by an interpreter, but we can not approve a rule of law which would make it unworthy of credit on that ground alone. See Annotation, "Use of Interpreter in court proceedings," 172 ALR 923. The defendant's attorney conceded that he was able to understand Spanish; to this extent there was a check upon abuses. Sapiens' testimony concerning the beating was verified in some particulars by Hartley.

The defense introduced as witnesses the defendant's

uncle, Nathan Copperfield, and the defendant's "third cousin," Bernadine Dickens. Both witnesses were present at the scene of the alleged crime and both not only testified that no assault took place but also swore that Sapiens left the Copperfield home unharmed. The resolution of these conflicting claims was a matter for the jury alone. The jury believed Sapiens and disbelieved defendant's witnesses. The prosecuting attorney successfully impeached both witnesses upon minor points during his cross examination, and this might easily have discredited their testimony in the eyes of the jury.

In our opinion, the defendant had a fair trial and the evidence was sufficient to support the verdict of the jury. The judgment of the conviction is therefore affirmed.

HARRIS, J., dissents.