Argued and submitted September 7, 1989, the judgment affirmed as to the guilt phase and reversed as to the penalty phase and the case remanded to the circuit court for resentencing April 3, reconsideration denied May 3, 1990

## STATE OF OREGON,
*Respondent,*

*v.*

## STEPHEN LEROY NEFSTAD,
*Appellant.*

## (CC C87-03-31733; SC S34971)

789 P2d 1326

Phillip M. Margolin, Portland, argued the cause and filed the brief and reply brief for appellant.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General; Virginia L. Linder, Solicitor General; and Diane S. Lefkow, Michael C. Livingston, Janet A. Metcalf, and Brenda J Peterson, Assistant Attorneys General.

Before Peterson Chief Justice, and Linde,* Carson, Jones, Gillette, Van Hoomissen, and Fadeley, Justices.

JONES, J.

Fadeley, J., filed a dissenting opinion.

---

* Linde, J., retired January 31, 1990.

## JONES, J.

In this case of automatic review, defendant appeals his conviction of aggravated murder and associated death sentence. We affirm defendant's conviction of aggravated murder. We find the sentencing proceeding to be inadequate for the reasons stated in *State v. Wagner,* 309 Or 5, 786 P2d 93 (1990). Accordingly, we remand the case to the circuit court for a new sentencing proceeding.

## FACTS

Shortly after midnight on Friday, March 13, 1987, defendant Stephen Leroy Nefstad and co-defendant Reyes Miranda drove to the Acropolis Tavern in Portland. There defendant struck up a conversation with the victim, Steven A. Jackson. At about 1:45 a.m., Jackson told his companions "that he would be right back" and then stepped outside the tavern with defendant and Miranda. Jackson was never seen alive again.

A few miles away from the tavern at 2:37 a.m., defendant Miranda used Jackson's automatic teller bank card to withdraw $200 from Jackson's account. Sometime during this period, Jackson was brutally murdered by repeated stab wounds to his chest, and his body was left off of a dead-end street. The front passenger area of Miranda's vehicle was covered with blood; Miranda's clothes were soaked with blood, and defendant also had blood on his clothes.

Defendant stated to his friends that "something heavy had gone down. That they [defendant and Miranda] had to take this guy out. That he was history." Miranda admitted that after the stabbing, his car looked like "Psycho III." When the police took defendant in for questioning, defendant identified himself as "Johnson" and gave a false date-of-birth. He told the police that "he didn't know anything about the homicide." Defendant told the officers an exculpatory story. The jury, however, found that he and Miranda had killed Jackson.

## GUILT PHASE

We address most of defendant's assignments of error raised in defendant's voluminous appellate brief and addenda.

## ASSIGNMENT OF ERROR NO. 1

Whether the trial court properly overruled defendant Nefstad's objections to the prosecutors' use of the words "I anticipate" during voir dire.

During voir dire, the prosecutors explained to several of the prospective jurors that they anticipated the trial to include a guilt phase and a penalty phase. Defendant Nefstad objected to the prosecutors' use of the words "I anticipate." The trial court overruled defendant Nefstad's objections. On appeal, defendant Nefstad complains that the prosecutors' repeated use of the phrase "I anticipate" constituted improper expressions of personal belief. The prosecutors' statements, however, were neither expressions of belief nor improper.

The examination of a juror on voir dire serves two purposes: (1) to ascertain whether a cause for challenge exists, and (2) to ascertain whether the parties desire to exercise their legal right of peremptory challenge. *State v. Lauth,* 46 Or 342, 349, 80 P 660 (1905). In an aggravated murder case, if the jury finds the defendant guilty, the same jury then determines whether he should receive a sentence of life imprisonment or death. ORS 163.150(1). Voir dire examination thus may include inquiries into each juror's feelings about the death penalty. *See Witherspoon v. Illinois,* 391 US 510, 88 5 Ct 1770, 20 L Ed 2d 776 (1968); *State v. Jensen,* 209 Or 239, 281, 289 P2d 687, 296 P2d 618, *appeal dismissed* 352 US 948, 77 S Ct 329, 1 L Ed 2d 241 (1956); *State v. Leland,* 190 Or 598, 227 P2d 786 (1951), *aff'd* 343 US 790, 72 S Ct 1002, 96 L Ed 1302 (1952). It was appropriate for the prosecutors to determine whether each juror's views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 US 412, 424, 105 S Ct 844, 83 L Ed 2d 841 (1985). *See also Adams v. Texas,* 448 US 38, 44, 100 S Ct 2521, 65 L Ed 2d 581 (1980) (in capital cases, states have interest in retaining jurors who can and will follow instructions in determining sentence).

A prosecutor cannot effectively learn the views of a juror who thinks that the inquiries into the death penalty merely are academic, and who does not understand that there truly exists the possibility of ultimately having to decide whether a defendant should receive a sentence of death. To

answer the prosecutor's questions candidly, the juror must anticipate fulfilling the role of a factfinder not only during the guilt phase but also during the penalty phase of the trial.

## ASSIGNMENT OF ERROR NO. 2

The issue here is whether the trial court properly excluded prospective juror Richardson for cause.[1]

Defendant summarized his argument as follows:

> "Reverand [sic] Richardson clearly stated that despite his views about the treatment of minorities in the criminal justice system and the effect that would have on his views on the death penalty, he could set aside those views and answer the three death questions in such a way as to result in the imposition of the death penalty in this case if the evidence warranted it. Therefore, the exclusion of Reverand [sic] Richardson violates the rules set down in *Witherspoon v. Illinois,* 391 US 510 (1968); *Wainwright v. Witt,* 469 US 412 (1985) and *Gray v. Mississippi,* [481] US [648], 107 S Ct 2045, 95 L Ed 2d 622 (1987)."

The trial court's ruling on the state's challenge for cause was not based on Richardson's opposition to the death penalty and did not violate "the rules" set forth in *Wainwright v. Witt, supra,* and *Witherspoon v. Illinois, supra.* Together the *Witt* and *Witherspoon* holdings define the constitutional limitations on the state's power to exclude a prospective juror who is challenged for cause because of his opposition to the death penalty.[2] *Witt* and *Witherspoon* plainly do not govern (much less prohibit) the exclusion of a prospective juror who, like Richardson, has shown through his voir dire testimony and jury questionnaire responses that he has other biases that substantially would impair his ability to try the issues in the case impartially and to follow the law.

We initially discuss the standard this court applies in reviewing a trial court's decision to exclude a prospective juror because of actual bias. In a criminal case, ORCP 57D(1)(g)

---

[1] Defendant claims that prospective jurors Richardson and Myers both were excluded because of their views on the death penalty, and for that reason he has combined his arguments in support of assignments of error Nos. 2 and 3. The record shows, however, that Richardson was excluded for other reasons. Accordingly, we address assignment of error No. 3 separately.

[2] The *Witt/Witherspoon* principles are discussed in detail in assignment of error No. 3.

governs challenges for cause based on actual bias. ORS 136.210(1). The rule provides:

> "Challenges for cause may be taken on any one or more of the following grounds:
>
> "* * * * *
>
> "(g) *Actual bias, which is the existence of a state of mind on the part of the juror, in reference to the action, or to either party, which satisfies the court, in the exercise of a sound discretion, that the juror cannot try the issue impartially and without prejudice to the substantial rights of the party challenging.* A challenge for actual bias may be taken for the cause mentioned in this paragraph, but on the trial of such challenge, although it should appear that the juror challenged has formed or expressed opinion upon the merits of the cause from what the juror may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but *the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially.*" (Emphasis added.)

In decisions dating back to the turn of the century, this court, applying statutes with provisions similar to those of ORCP 57D(1)(g), consistently has confirmed that (1) it does not review *de novo* a trial court's ruling on a challenge based on actual bias, and (2) it accords great weight to a trial court's finding of fact whether a prospective juror can try a case impartially.[3]

Specifically, this court has held that a trial court's exercise of discretion under the applicable statute "will not be disturbed in the absence of a finding of a manifest abuse of that discretion." *Lambert v. Srs. of St. Joseph,* 277 Or 223, 229, 560 P2d 262 (1977). *See also State v. Brumfield,* 104 Or 506,

---

[3] *See, e.g., Lambert v. Srs. of St. Joseph,* 277 Or 223, 228-29, 560 P2d 262 (1977) (a reviewing court "must give great weight to the fact that the trial judge had the advantage of having the challenged juror before him and an opportunity to observe his demeanor, apparent intelligence and candor, all of which are important in determining bias"); *State v. Stigers,* 122 Or 113, 119-20, 256 P 649 (1927) ("[w]hether a juror is actually biased is a question of fact to be determined by the trial judge"); *State v. Savage,* 36 Or 191, 203, 60 P 610, *reh den* 36 Or 217, 61 P 1128 (1900) (when a juror is challenged for actual bias, the trial court, "having heard the testimony of the juror, and noted his manner and bearing while under examination, is much better able to judge of his power to disregard any opinion he may have formed or expressed from what he has read or heard than is an appellate court from an inspection of the transcript containing the questions propounded and the answers thereto"). *See also State v. Armstrong,* 43 Or 207, 216, 73 P 1022 (1903).

527, 209 P 120 (1922); *State v. Armstrong,* 43 Or 207, 73 P 1022 (1903). The court also has observed that "[i]t is difficult to formulate a concise and accurate definition" of the term, "abuse of discretion." *Lambert v. Srs. of St. Joseph, supra.* In any event, if the trial court's finding of actual bias is supported by the record of the voir dire, taken as a whole, the finding should not be disturbed on appeal.

■ In this case, the trial court found, on the basis of Richardson's responses on the jury questionnaire and his voir dire testimony, that he had pre-existing biases concerning the criminal justice system and members of minority groups that would have prevented him from trying this case impartially. Defendant Nefstad has simply misconstrued the reasons for the exclusion of this prospective juror, effectively ignoring the express findings of the trial court. He contends that:

> "The [trial] court gave several reasons for excluding Reverand [*sic*] Richardson from the panel, but it is clear that *despite the court's statements,* the *only* basis for exclusion for cause — and one of the reasons that the court clearly stated — was the Reverand's [*sic*] opposition to the death penalty." (Emphasis added.)

The record is plainly to the contrary. Notwithstanding defendant's reading of the trial court's decision, no *Witherspoon/ Witt* question is presented by the trial court's ruling.

At the conclusion of the prosecutor's examination of Richardson on October 21, 1987, the trial court allowed the state's challenge for cause, explaining its findings and conclusions, in pertinent part, as follows:

> "I am not satisfied from his answers to the questions on his attitude on the death penalty one way or the other, and it seems to me that some of the answers indicate he might not be able to follow the law.
>
> "He was ultimately — and in a series of leading questions — led to answer that he could follow the law, but he started out by saying that he did not think he could.
>
> "Even more than that, it seems to me that the basic problem is that he has biases that would interfere with his deciding of criminal cases. He is obviously a very bright and thoughtful man. In his answer to Question No. 23 on the questionnaire, if this were not a death penalty case and were a routine case we

were trying, for instance an unauthorized use of a motor vehicle or Burglary II, and we had a juror who said that he or she had such strong feelings about the general subject matter [of criminal law] that would impair their ability to render a fair and impartial verdict in the case, we would excuse the juror without hesitation.[4]

"He has now amplified that as to why he has those feelings, but he hasn't retreated from it at all.

"It seems to me that the overall thrust of that is he's told us he thinks he would have difficulty following the law.

"* * * * *

"He said he could not set aside [his views] and hear the case on its merits. He said it orally. He said it in his questionnaire. I am prepared to believe he meant what he said.

"* * * * *

"Yes. I'm allowing the State's challenge for cause. I'm not allowing it on the basis to answers on the death penalty. I'm allowing it on the basis that the juror has indicated to us that he has biases from experience outside the courtroom that he thinks would affect his thinking about this case.

"* * * * *

"His answer that concerned me was his answer regarding minorities."

The voir dire testimony on which defendant relies suggests (at best) that Richardson *thought* that he could vote to impose the death penalty in this case, *if* he were convinced that defendant had received a fair trial. It does not show that he would have been able to disregard his biases concerning the criminal justice system and minority group members as he heard and considered the evidence and decided the factual issues in the guilt phase and in the penalty phase, if one were necessary. Earlier, he had confirmed that his preconceptions about those issues would prevent or substantially impair his ability to reach a fair and impartial verdict and had admitted frankly that it would be "very difficult" for him to follow a jury instruction "not to consider the race or creed of the individual Defendants." The record shows, and the trial court properly

---

[4] Question No. 23 asked: "Do you have such strong personal or philosophical feelings about the general subject matter of criminal law so as to impair your ability to render a fair and impartial verdict in this case?" Richardson answered, "Yes."

concluded, that Richardson had not "retreated" from his long-standing beliefs (as initially expressed) "at all."

Richardson's voir dire testimony and his jury questionnaire, taken as a whole, are more than sufficient to support the trial court's finding that Richardson had biases (other than a general opposition to the death penalty) that would have prevented him from following the law and deciding this case on its merits. Without equivocation, he explained his views and the effect that they would have on his ability to be an impartial juror at the beginning of his voir dire testimony. No basis exists in the record for this court to reverse the trial court's decision to allow the state's challenge for cause.

■ Defendant Nefstad also complains that he "was not given a chance to rehabilitate [Richardson] on issues the [trial] court felt provided a legal basis for exclusion" and claims that the trial court's refusal to allow such re-examination "amounts to a violation of the Federal Due Process Clause, Amendment-XIV, United States Constitution, * * * Article I, section 11, of the Oregon Constitution, which gives defendant a right to trial by an impartial jury and ORS 136.001 (right to trial by impartial jury)."

ORS 136.210(1) provides that prospective jurors in a criminal case "shall * * * be examined as to their qualifications, first by the court, then by defendant and then by the state." As discussed above, Richardson's voir dire examination began on October 9, 1987, with a brief examination by the trial court, during which Richardson acknowledged that it would be difficult for him to set aside his personal feelings and follow the law, if following it meant imposition of the death penalty. The trial court then asked counsel whether they wished "to question further in this area." Apparently because of the lateness of the hour, the prosecutor proposed that they "question as to the specific issue." The trial court agreed and defendant Miranda's counsel began his examination of Richardson. In response to counsel's first questions, Richardson revealed his biases concerning "the criminal justice system" and "minorities" and the extent to which those views would interfere with his ability to follow the trial court's instructions and to decide this case on its merits. The trial court did not intervene during the examination to restrict the scope of counsel's inquiry.

Defendant Nefstad's counsel decided not to question Richardson at that time, explaining:

> "I would pass at this time. Maybe if there is a challenge I might want to question, but I will pass to the state only on this issue."

The prosecutor then inquired, and several of Richardson's responses reflected his continuing belief that the criminal justice system operated unfairly.

Richardson's voir dire examination resumed on October 21, 1987, with questioning by defendant Nefstad's counsel. Counsel's inquiries concerned the presumption of innocence in a criminal proceeding, the state's burden of proof, and the procedure for a joint trial. The prosecutor then questioned Richardson and asked, *inter alia,* without objection:

> "Could you explain a little more fully to me the experiences you touched on on Friday which led you to believe that minorities are discriminated against in the criminal justice system?"

Thus, before the trial court's ruling on the state's challenge, defendant Nefstad's counsel had two opportunities to question Richardson fully about his views on minorities and the criminal justice system, but counsel chose not to do so. Although the trial court denied defendant Nefstad's request to re-examine Richardson,[5] defendant was not denied the opportunity to question Richardson before then about his admitted biases, or on any matter related to his qualifications to be a juror in this case. For this reason, defendant Nefstad's reliance on *O'Connell v. State,* 480 So2d 1284, 1286-87 (Fla 1985), to support his due process claim is completely misplaced, as the following excerpt from the decision demonstrates:

> "[T]he trial court's refusal to allow the defense an opportunity to examine the two 'death scrupled jurors' cannot be justified

---

[5] Defendant Nefstad did not ask to re-examine Richardson when responding initially to the state's motion to exclude Richardson for cause, before the court ruled. It was not until the trial judge indicated that he would allow the state's motion and outlined the reasons for that decision that counsel for defendant Nefstad argued:

> "We should have then, Your Honor, — well, Mr. Alexander and I should have an opportunity to examine on this particular motion because we have not had a chance to examine the juror."

as an exercise of 'control of an unreasonably repetitious and argumentative voir dire questioning,' *since defense counsel never got to ask either of them a single question.*

"In contrast, the prosecutor not only had the opportunity to question each juror individually, he was also permitted to re-examine the jurors after defense counsel had questioned them and in several cases after defense counsel had challenged them for cause, for the purpose of rehabilitating them. *This double standard on the part of the trial judge amounted to a violation of due process.*" (Citation omitted; emphasis added.)

That is not this case.

Defendant Nefstad does not explain how, on this record, his being denied a chance to re-examine Richardson violated his statutory and constitutional right to an impartial jury. Nothing in the record suggested that he could have "rehabilitated" Richardson. *See generally State v. Affeld,* 307 Or 125, 128-29, 764 P2d 220 (1988) (normally, an offer of proof is required to preserve error when a court excludes testimony). In any event, the purpose of the voir dire examination was investigation, not persuasion. As this court observed in *State v. Miller,* 46 Or 485, 487, 81 P 363 (1905),

"When it satisfactorily appears from the examination of a person called as a juror that he possesses such a state of mind that he cannot try the issues impartially, the introduction of further testimony would be superfluous."

We are not persuaded by this assignment of error.

### ASSIGNMENT OF ERROR NO. 3

The next issue is whether the trial court properly excused prospective juror Myers for cause.

The question presented is whether the trial court's decision to excuse Myers for cause satisfied the *Witt/Witherspoon* standard for exclusion of a prospective juror because of his views on the death penalty.

In *Witherspoon v. Illinois, supra,* 391 US at 522, the Court held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." The Court's

holding in *Witherspoon* does not express "a ground for challenging any prospective juror[; i]t is rather a limitation on [a] State's power to exclude." *Adams v. Texas, supra,* 448 US at 47-48. In *Wainwright v. Witt, supra,* the Court re-examined and clarified the *Witherspoon* rule and held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment" was the standard that the Court had expressed in *Adams v. Texas, supra,* 448 US at 45:

> "That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "[6]

*Wainwright v. Witt, supra,* 469 US at 424. *See Darden v. Wainwright,* 477 US 168, 106 S Ct 2464, 91 L Ed 2d 144 (1986); *State v. Wagner,* 305 Or 115, 175, 752 P2d 1136 (1988), *vacated* 492 US ___, 109 S Ct 3235, 106 L Ed 2d 583 (1989), *on remand* 309 Or 5, 786 P2d 93 (1990).

Defendant Nefstad argues that the *Witherspoon* standard differs from that established in *Adams* and *Witt* in the following respects:

> "The *Witherspoon* standard only permits the exclusion of jurors from a panel [in a death penalty case] who unequivocally indicate that they could not consider the imposition of death. Under *Witt,* a juror may be excluded if his views would prevent or substantially impair the performance of his duties."

Defendant further asserts that "Oregon has no state law decision setting the standard for exclusion in this situation." Defendant's reading of "state law" on this question and his

---

[6] The Court in *Wainwright v. Witt, supra,* 469 US at 423, explained:

"Exclusion of jurors opposed to capital punishment began with a recognition that certain of those jurors might frustrate the State's legitimate interest in administering constitutional capital sentencing schemes by not following their oaths. *Witherspoon* simply held that the State's power to exclude did not extend beyond its interest in removing those particular jurors. But there is nothing talismanic about juror exclusion under *Witherspoon* merely because it involves capital sentencing juries. *Witherspoon* is not grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, but in the Sixth Amendment. Here, as elsewhere, the quest is for jurors who will conscientiously apply the law and find the facts. That is what an 'impartial' jury consists of and we do not think, simply because a defendant is being tried for a capital crime, that he is entitled to a legal presumption or standard that allows jurors to be seated who quite likely will be biased in his favor."

*Witt/Witherspoon* analysis are not accurate. First, this court in *State v. Wagner, supra,* 305 Or at 175, applied the same standard expressed in *Witt:*

> "The general rule for testing error in this respect is quite simple. The issue is whether the prospective juror's views would prevent or substantially impair the performance of the duties of the person if selected as a juror."

Second, the holding in *Witherspoon* is much narrower than defendant suggests. The Court in *Witherspoon* determined only those circumstances in which prospective jurors could not be excluded (*i.e.,* merely because they expressed general objections to the death penalty) and did not decide when they could. *See Wainwright v. Witt, supra,* 469 US at 418-22. Third, the Court in *Witt* expressly rejected the suggestion, gleaned from dicta in footnotes 9 and 21 of its discussion in *Witherspoon,* that the proper test for exclusion should include a requirement that a prospective juror make it "unmistakably clear" that he or she would " 'automatically' vote against the death penalty." *Wainwright v. Witt, supra,* 469 US at 418-25.

Defendant does not discuss, or even acknowledge, the language from *State v. Wagner, supra,* quoted above, nor does he argue that Article I, section 11, of the Oregon Constitution requires this court to apply what defendant claims to be the test under *Witherspoon,* rather than the *Witt* standard. In any event, as the Court in *Witt* explained,

> "There is a good reason why the *Adams* test is preferable for determining juror exclusion. First, although given *Witherspoon's* facts a court applying the general principles of *Adams* could have arrived at the 'automatically' language of *Witherspoon's* footnote 21, we do not believe that language can be squared with the duties of present-day capital sentencing juries. In *Witherspoon* the jury was vested with unlimited discretion in choice of sentence. Given this discretion, a juror willing to consider the death penalty arguably was able to 'follow the law and abide by his oath' in choosing the 'proper' sentence. Nothing more was required. Under this understanding the only veniremembers who could be deemed excludable were those who would never vote for the death sentence or who could not impartially judge guilt.

> "After our decisions in *Furman v. Georgia,* 408 US 238 (1972), and *Gregg v. Georgia,* 428 US 153 (1976), however,

sentencing juries could no longer be invested with such discretion. As in the State of Texas, many capital sentencing juries are now asked specific questions, often factual, the answers to which will determine whether death is the appropriate penalty. In such circumstances it does not make sense to require simply that a juror not 'automatically' vote against the death penalty; whether or not a venireman *might* vote for death under certain *personal* standards, the State still may properly challenge that venireman if he refuses to follow the statutory scheme and truthfully answer the questions put by the trial judge. To hold that *Witherspoon* requires anything more would be to hold, in the name of the Sixth Amendment right to an impartial jury, that a State must allow a venireman to sit despite the fact that he will be unable to view the case impartially." *Wainwright v. Witt, supra,* 469 US at 421-22 (emphasis in original).

■ Thus, although a trial court may not exclude a prospective juror for cause solely because he has general objections to the death penalty, *see Witherspoon v. Illinois, supra,* 391 US at 522, a court may exclude a prospective juror whose views on the death penalty would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt, supra,* 469 US at 424. These principles are not applied in a vacuum.

In response to the first question that he was asked about the death penalty, at the beginning of his voir dire testimony, Myers confirmed that he could not vote for the death penalty if he were to serve on a jury and that he did not believe that it was "right" for him "to decide someone else's death."

■ Focusing on Myers's responses during examination by counsel for defendant Miranda, defendant Nefstad contends that "Myers stated on numerous occasions that he would be able to set aside his personal views and vote for the death penalty." Defendant fails to take into account that this is not a case in which a prospective juror simply said that he was strongly opposed to the death penalty. Here, Myers not only stated at the outset his opposition to the death penalty, but also explained, at the same time, that because of that view he could not vote for it if he were to serve on the jury. In addition, a number of his answers to subsequent questions by counsel for defendant Miranda were equivocal on this issue;

*e.g.,* (1) he stated that he would "*attempt* to follow the [court's] instructions," (2) he testified, "I think I could take the [evidence] and *try* to decide the [penalty phase] question based on the [evidence], (3) he acknowledged that "this further discussion" had *not* "cleared up any uncertainty in [his] mind about how [he] would handle his job as a juror," and (4) he said that his feelings about the death penalty "would *hopefully* not affect [his] decision on what the facts of the case are." (Emphasis added.)

Even if this later testimony, viewed in isolation, might have suggested what defendant now claims for it, that alone would not require the conclusion that the trial court improperly excluded Myers. The "mere statement by a [prospective] juror that he will be fair and afford the parties a fair trial becomes less meaningful in light of other testimony and facts which at least suggest the probability of bias." *Lambert v. Srs. of St. Joseph, supra,* 277 Or at 230. Here, Myers's other voir dire testimony did far more than "suggest the probability of bias." At the beginning of his testimony, Myers confirmed the fact of his bias and the effect that it would have on his deliberations, if he were to serve on a jury. When the prosecutor asked Myers to clarify whether he meant that he would *try* to set aside his bias or that he *could* in fact do so, Myers admitted that he "would not be able to separate [his] thoughts about it from the facts" and acknowledged that his "feelings about the death penalty would substantially interfere with [his] ability to look at the evidence and follow the law."[7] After Myers agreed with the trial judge that he had "answered the question both ways," the trial judge "press[ed]" him on the matter, explaining that Myers knew his true state of mind. Myers told the judge that, "[a]t the risk of contradicting [himself] again, [he] could not assure [the judge] that [he] would not let his feelings interfere."

The trial court's question and Myers's response came after defendant Miranda's counsel and the prosecutor had completed their examination of Myers. The trial judge, who had an opportunity to hear Myers's responses and to observe his demeanor during the previous questioning, concluded that Myers's answer to the judge's question (and, by implication,

---

[7] The record does not support defendant's claim that the prosecutor "had intimidated Mr. Myers into giving that answer."

his answers to the prosecutor's inquiries) should be believed. In such a case, particularly where the prospective juror has given admittedly contradictory responses, the trial court's conclusion with regard to his "ultimate qualifications is entitled to great weight," where the court had the advantages of "observing [his] demeanor, apparent intelligence and candor, all of which are factors in the trial of a challenge for cause." *State v. Brumfield, supra,* 104 Or at 528-29 (capital murder). *See also State v. Savage,* 36 Or 191, 203, 60 P 610, *reh den* 36 Or 217, 61 P 1128 (1900). As the Supreme Court explained in *Witt v. Wainwright, supra,* 469 US at 424-29:

> "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. \* \* \* [T]his is why deference must be paid to the trial judge who sees and hears the juror.
>
> "\* \* \* \* \*
>
> "The trial judge is of course applying some kind of legal standard to what he sees and hears, but *his predominant function in determining juror bias involves credibility finding whose basis cannot be easily discerned from an appellate record.*" (Emphasis added.)

*See also Darden v. Wainwright, supra,* 477 US at 178.

█ As the trial court found, Myers's voir dire testimony, taken as a whole, established that his views on the death penalty would have interfered substantially with and impaired his performance as a juror in accordance with his oath and the court's instructions. A prospective juror in a capital case may be excused on these grounds without violating the defendant's right to an impartial jury. *Wainwright v. Witt, supra,* 469 US at 424; *State v. Wagner, supra,* 305 Or at 175. The record supplies no basis for this court to conclude that the trial court's decision to exclude Myers for cause was error.

## ASSIGNMENTS OF ERROR NOS. 4 - 7

Defendant's arguments under assignments of error Nos. 4-7 present questions concerning place-of-trial venue and the state's authority to define and prosecute criminal offenses. We addressed the how, when, and where of this murder with respect to jurisdiction and venue in *State v. Miranda*, 309 Or 121, 129-30, 786 P2d 155 (1990). Defendant's argument for these assignments of error are not well taken.

## ASSIGNMENTS OF ERROR NOS. 8 - 10

*No. 8:* Whether during the guilt phase, the trial court correctly instructed the jury that for felony murder to constitute aggravated felony murder, defendant must have committed the homicide "personally."

*No. 9:* Whether the trial court correctly refused to give defendant's requested guilt phase jury instruction No. 3 regarding the meaning of "personally."

*No. 10:* Whether during the guilt phase, the trial court correctly overruled defendant's objection to the state's jury argument that defendant "personally" committed a homicide if he restrained the victim so as to allow a confederate to deliver the death blow.

■ ORS 163.095(2)(d) provides that a person commits the crime of aggravated felony murder if he "personally and intentionally committed the homicide" while committing, attempting to commit, or fleeing from the commission of certain specified felonies, including first degree robbery. *See also* ORS 163.115(2)(b).

In his combined argument on assignments of error Nos. 8 through 10, defendant focuses on the meaning of "personally" as used in ORS 163.095(2)(d). Defendant assigns error to the instruction that the trial court gave on the meaning of "personally," to the trial court's failure to give his requested instruction defining the term, and to a portion of the state's jury argument regarding the application of the statutory term to the facts of this case.

Defendant argues that "personally" is a word of "common usage" that should be given its "natural, plain and obvious meaning." The state agrees. The logical consequence

of this conclusion is that no instruction is required to tell the jurors what "personally" means.

In *State v. Nichols,* 236 Or 521, 535, 388 P2d 739 (1964), the defendant, charged with second degree murder (*former* 163.020), requested an instruction defining the word "deliberate" in the phrase "deliberate use of a deadly weapon." This court held that the jury need not be instructed on the meaning of that wording, observing that "[w]e think the word was understandable without elaboration." 236 Or at 535.

"Personally" also is a word that was understandable to the jurors without elaboration by the trial court in the instructions. This does not mean that the word always will be easy to apply to a given set of facts, but the difficulty lies in the application and not in the definition of the word.

"Personally" is not statutorily defined. Nothing in either the legislative history of the aggravated murder statute or in its judicial interpretation suggests that "personally" has any statutory meaning that departs from the common understanding of the word.

This legislative history does not suggest that "personally" as used in the aggravated murder statute has any meaning that differs from its everyday, commonplace meaning. Instead, the history simply demonstrates that the legislature added "personally" to stress a distinction between aggravated felony murder and felony murder — to be guilty of aggravated felony murder a defendant's involvement in the homicide must be personal; mere participation in the underlying felony is not enough.[8]

---

[8] At the May 31, 1977, hearing of the Senate Judiciary Committee, Senator Kafoury asked Edward Sullivan, the chairman of the Governor's Task Force on Corrections, to "define the part about felony murder." Mr. Sullivan responded:

*"The controversy in the House Judiciary Committee was whether or not anyone [who] was involved in the get-away-car or some part of a felony would also fall into this category. The answer was no.* The insertion of the word 'personal' * * * was made to get at the person who deliberately committed murder in the course of a felony but not any of the other individuals who may have participated in the course of the felony. (Whether it be robbery or theft or whatever.) What is meant * * * is that the person must have pulled the trigger or used the knife or what have you, himself * * *." Minutes, Senate Judiciary Committee (HB 2011), May 31, 1977, at 3 (emphasis added).

The few cases interpreting the aggravated felony murder statute simply confirm this distinction without suggesting that "personally" has any arcane or unusual meaning in this context.[9] In *State v. Reynolds,* 289 Or 533, 538-39, 614 P2d 1158 (1980), this court held that aggravated felony murder, ORS 163.095(2)(d), and felony murder, ORS 163.115(1)(b), are "distinct offenses" although they "overlap." "ORS 163.095(2)(d), enacted in 1977, now differentiates between [a] robber who personally committed the homicide and [a] robber who *merely* participated in the felony." 289 Or at 539 (emphasis added). *See also State v. Cohen,* 289 Or 525, 529, 614 P2d 1156 (1980).

In sum, as defendant contends, and as the legislative history and caselaw confirm, "personally" is a word of "common usage" that should be given its "natural, plain and obvious meaning." This commonplace meaning did not need to be supplied to the jurors by the trial court during the guilt phase instructions; the jurors already knew the meaning of the word.

■ Because "personally" did not need to be defined for the jury, the trial court correctly could have omitted any explanation of the term from the guilt phase instructions. *See State v. Nichols, supra.* Nonetheless, the trial court instructed the jury as follows:

> "Personally in the context of aggravated murder means that to be guilty of that crime the Defendant must have had an actual role in causing the death and not merely a role in the felony during which the death occurred."

This instruction may not have been strictly required[10] but that does not mean that the trial court erred in giving it.

The trial court's instruction stressed that to find defendant guilty of aggravated felony murder the jurors had to conclude that he had personally participated in the commission of the homicide ("Defendant must have had an actual role in causing the death"). The instruction also emphasized the distinction between aggravated felony murder and felony

---

[9] None of these cases presented the multiple defendant issue raised in this case.

[10] Defendant excepted to the giving of this instruction but he did so on the basis "that personally is a word of common definition. I believe there is some case law when you don't use a jury instruction to define it."

murder (for aggravated felony murder defendant cannot have had "merely a role in the felony during which the death occurred"). Because this instruction was correct, the trial court did not err in giving it.

 Defendant says that he requested the following instruction on the meaning of "personally":

> "The word 'personally' was placed in the Aggravated Murder statute to make sure that only the person or persons who actually and intentionally caused the death of the victim would face the more serious penalties imposed by this statute. So, in a case where the State proves to you beyond a reasonable doubt that victim died by stabbing during the course of a robbery, only a defendant who used the knife intentionally to cause the death of the victim and delivered a blow that caused death may be convicted of aggravated murder."

"Personally" is a word of common usage that did not need to be defined for the jury; thus, the instruction was unnecessary. *See State v. Nichols, supra.* Moreover, the requested instruction was not correct.[11] Accordingly, the trial court did not err in refusing to give this instruction.

Defendant's final assignment of error regarding the meaning of "personally" centers on a portion of the state's jury argument at the close of the guilt phase. In that argument, the prosecutor first discussed felony murder using a bank robbery analogy. The prosecutor described a bank robbery involving two robbers, only one of whom is armed and neither of whom intends to shoot anyone. The armed robber shoots the gun into the air solely to command attention but the bullet "ricochets and kills the bank teller. There is no intent to do a murder, to kill anybody, but both of them are guilty of felony murder because they aided and abetted each other" in the commission of the felony during which the homicide occurred.

The prosecutor then altered his bank robbery scenario so that "it could apply to both of our bank robbers." The

---

[11] Aside from its informal phrasing, the first sentence of defendant's requested instruction would have added nothing of substance to the guilt phase instructions that the trial court gave informing the jury that the murder must have been committed personally and intentionally for defendant to be found guilty of aggravated felony murder. The second sentence of defendant's requested instruction was a comment on the evidence of this case; the trial court correctly refused to give it. ORCP 59E; ORS 163.330(1); *State v. Walker,* 244 Or 404, 411, 417 P2d 1004 (1966).

prosecutor said th[●] both robbers would guilty of aggravated murder

> "if both of them had an actual role in causing the death of that bank teller if one of the robbers held the teller down to allow the other person to shoot, both of them would have an actual role and be personally causing the intentional killing of the bank clerk."

Defendant objected "based on the previous discussions we had with the Court." The trial court overruled the objection, stating that defendant would "have a continuing objection."

Although the legal theory underlying defendant's objection is not clear, it appears that the real basis of defendant's claim is an attack on the sufficiency of the evidence; defendant's underlying contention is that if he held the victim but did not stab him, or if he stabbed the victim but did not deliver the fatal blow, then the evidence would have been insufficient to sustain his conviction for aggravated felony.

To prevail on this issue, defendant's position must be that, as a matter of law, stabbing a victim without delivering the death blow or pinioning the victim so that the death blow can be struck, does not constitute personally committing a homicide.

To state this contention is to refute it. Joining in the stabbing of a dying victim or restraining the victim so that he cannot avoid the fatal knife thrusts constitutes "personally" committing the homicide. Thus, in the instant case, even if defendant choked and restrained the victim but did not also stab him, nonetheless defendant "personally" committed this homicide and he is directly responsible for it. As the jury found, the evidence established that defendant actively, personally, and intentionally committed the murder of Steven Jackson. The prosecutor's argument on this issue was correct, and the trial court properly overruled defendant's objection to it.

## ANSWER TO ASSIGNMENT OF ERROR NO. 11

The issue is whether the trial court properly overruled defendant Nefstad's objections to the opinion testimony of Elizabeth Carpenter.

Carpenter assisted in the investigation of Jackson's murder.[12] She examined the interior of defendant Miranda's car, analyzed blood and other physical evidence found in the car, and examined clothing belonging to Jackson, defendant Miranda, and defendant Nefstad, including a blue jean jacket seized from defendant Nefstad. She discovered "quite a bit of blood" on the jacket; however, she was not able to determine through chemical testing whose blood it was or when it had been deposited on there.[13] After noting the inconclusive test results, Carpenter acknowledged that, "[f]rom a scientific point of view," she could not determine whether the jacket had been inside defendant Miranda's car "at the time Steven Jackson died." The prosecutor then asked:

> "Okay. Now, however, I do want to give you an assumption. I want to ask you if you have an opinion based on the hypothetical assumption, assuming that this jean jacket identified as belonging to [defendant Nefstad] was inside the 1973 Plymouth when Steven Jackson was killed inside, *do you have an opinion to a reasonable professional certainty as to where it was*?" (Emphasis added.)

Defendant Nefstad objected, arguing that "no testimony whatsoever [had been presented] to put him in that car." The trial court overruled the objection, explaining, in part:

> "The jury is aware and can be aware of whatever evidence they feel is lacking to connect it. I think the jury can consider that in evaluating the opinion."

The trial court also overruled defendant's objection that "[t]his is outside the expertise of the witness." The prosecutor then asked the question again, and Carpenter responded:

> "Assuming that this jacket was in the car when Steven Jackson was killed, I believe it was worn by an individual who

---

[12] Carpenter has been a criminalist with the Oregon State Police Crime Laboratory since 1977. She analyzes physical evidence and has assisted in over 100 homicide investigations. She has a degree in chemistry and her training, in addition to her laboratory experience, includes F.B.I.-sponsored courses in "blood typing." For approximately two-and-a-half years she has been acting supervisor of the laboratory's blood typing and chemistry sections and has experience in "blood pattern identification and analysis."

[13] Carpenter explained that she "had a very difficult time leaching the blood out of the jacket" and that the jacket had the "smell," "appearance," and "characteristics" of "having been washed."

had his arm, his left arm, around the neck of Steven Jackson, possibly and probably in the back seat."

 Defendant Nefstad contends that the trial court's ruling was error because Carpenter "was not able to say that blood found on [his] jeans jacket was the victim's blood, was not able to say when the blood was deposited on the jacket and was not able to point to any evidence that would place [him] or the jacket in the car when Steven Jackson was killed." These factors may go to the weight the jury should have given the testimony but they did not affect its admissibility. The facts assumed by an expert in forming her opinion did not need to come from her firsthand observations or analysis. The dispositive question is whether sufficient evidence was in the record to support a finding by the trier-of-fact that the assumed facts existed. That requirement was satisfied here.

OEC 703 specifies the permissible bases for an expert's opinion testimony:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Facts are "made known to the expert" at trial in one of two ways: (1) the expert attends and listens to the testimony of other witnesses, or (2) counsel asks a hypothetical question containing essential facts drawn from or supported by other testimony and evidence. *See* Kirkpatrick, Oregon Evidence 309 (1982); Legislative Commentary to OEC 703. The assumed fact here was "made known to the expert" through the prosecutor's hypothetical question. Although no witness testified that he had seen defendant Nefstad wearing the jacket in defendant Miranda's Plymouth when Jackson was killed, the evidence was sufficient to support a finding by the jury to that effect, and that is all that was required.

OEC 104(2) authorizes the admission of conditionally relevant evidence:

> "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."

Under the rule, the ultimate determination whether the condition of fact has been satisfied is made by the jury. As Professor Kirkpatrick explains:

> "If, after all the evidence is submitted, the court concludes that the evidence would not support a jury finding that the condition of fact has been fulfilled, the court should instruct the jury to disregard the evidence. In all other cases, except where the condition is proven as a matter of law, the court should instruct the jury to consider the issue and to disregard the evidence unless the jury finds the condition was fulfilled.
> * * *
>
> "* * * * *
>
> "Advance proof of fulfillment of a condition of fact is not necessarily a prerequisite to the introduction of conditionally relevant evidence." Kirkpatrick, *supra* at 22.

*See also State v. Stringer,* 292 Or 388, 393, 639 P2d 1264 (1982) ("[w]hen the evidence upon which an expert bases his opinion is contradicted by the other evidence, the jury determines which evidence is to be accepted as correct and judges the credibility of the expert's testimony accordingly").[14]

We have reviewed the evidence in the record and find it was sufficient to support a finding that defendant Nefstad's jacket had been in the Plymouth when Jackson was killed. Accordingly, the trial court did not err in admitting the testimony for the jury's consideration.

## ASSIGNMENTS OF ERROR NOS. 12 - 14

*No. 12:* Whether the trial court correctly refused to give defendant Nefstad's requested guilt phase instruction no.

---

[14] We note that at the close of the evidence, the trial court properly instructed the jury:

"An expert witness is a person who has some special skill or education or training in a particular field. Even though expert witnesses may testify about their opinions, you as a jury are not required to accept those opinions.

"To determine the value you will give, if any, to an expert opinion, you should consider such things as the expert's qualifications, the expert's opportunity and ability to form the opinion, the expert's believability and how the expert reached the opinion or conclusion.

"Questions have been asked in which a witness was requested to assume that certain facts were true and give an opinion based on those assumed facts. Those are called hypothetical questions.

"If you find that any of the facts assumed and relied upon by the witness in forming an opinion were not established by the evidence or were untrue then you must disregard that opinion."

4 that was intended to list the elements of aiding and abetting, to state the burden of proof on each element, and to define those situations that would not support a finding of aiding and abetting liability.

*No. 13:* Whether the trial court correctly refused to give defendant Nefstad's requested guilt phase instruction no. 5 on "mere association."

*No. 14:* Whether the trial court correctly refused to give defendant Nefstad's requested guilt phase jury instruction no. 6 on "mere presence."

Defendant requested the following guilt phase instructions:

"DEFENDANT'S REQUESTED
JURY INSTRUCTION NO. 4

"The mere fact that a defendant knows that a crime is being committed is not sufficient to establish that the defendant either directed or aided and abetted or conspired in the commission of the crime. Furthermore, the fact that a defendant acquiesced in the criminal acts of another and wished those criminal acts to succeed is not sufficient to make the defendant an aider and abettor or principal or co-conspirator in the crime.

"Before you find that person is a principal or aider or abettor or co-conspirator in a crime, the State must prove to you beyond a reasonable doubt that all of the following elements exist:

"1. The Defendant must have known that a criminal venture was occurring; and

"2. The Defendant must have associated himself with the act; and

"3. The Defendant must have participated in the criminal venture as something he wished to bring about;

"4. The Defendant must have committed some overt act which was intended to make the criminal venture a success.

"Unless all of the above elements are proved to your satisfaction by the State beyond a reasonable doubt, you may not find that the Defendant was a principal or aider and abettor or co-conspirator in the crime charged."

## "DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 5

"Guilt may not be inferred from mere association with the guilty party."

## "DEFENDANT'S REQUESTED JURY INSTRUCTION NO. 6

"Mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant committed the crime or aided and abetted the commission of the crime unless you find beyond a reasonable doubt that the defendant was a participant in the commission of the crime and not merely a knowing spectator."

The state requested jury instructions on aiding and abetting liability that were based on Uniform Criminal Jury Instructions (UCrJI) nos. 1053 and 1054.[15] The trial court gave the state's requested instructions as follows:

"As to the charge of felony murder and the unauthorized use of a motor vehicle, a person who is involved in committing a crime may be charged and convicted of that crime if with the intent to promote or facilitate the commission of crime, the person charged aids and abets someone else in committing the crime.

"* * * * *

"A person aids and abets another person in the commission of a crime if the person charged with intent to promote or make easier the commission of the crime, encourages, procures, advises or assists by act or advice the planning or the commission of the crime."

---

[15] UCrJI no. 1053 states:

"A person who is involved in committing a crime may be charged and convicted of that crime if, with the intent to promote or facilitate commission of the crime, that person [aids and abets someone in committing the crime] [solicits or commands someone to commit the crime] [attempts to aid or abet someone in committing the crime] [having a legal duty to prevent someone from committing the crime, fails to make an effort to prevent the crime]. Under these circumstances, it is not necessary for that person actually to be personally present at the time and place of the commission of the crime."

UCrJI no. 1054 states:

"A person aids and abets another person in the commission of a crime if [he] [she]

"(1) With the intent to promote or make easier the commission of the crime,

"(2) Encourages, procures, advises, or assists, by act or advice, the planning or commission of the crime."

At the conclusion of the trial court's guilt phase instructions to the jury, defendant Nefstad excepted to the court's refusal to give his requested instructions nos. 4, 5 and 6:

> "[Defendant Nefstad's counsel:] I would object to not giving * * * a series of instructions that I proffered: 4, 5 and 6, which all have to do with the fact that the mere fact that a Defendant is present in a crime, et cetera, is not grounds for conviction. I consider those to be a defense."

On appeal, defendant asserts that "he requested the [above] three instructions (on aiding and abetting) so the jury would be aware of the rules of law set out in them, which defendant considered to be a defense to the crime charged."

The trial court is to instruct the jurors on matters of law necessary for reaching for their verdict. ORCP 59B; ORS 136.330(1). It is undisputed that the trial court's instructions to the jury on the law of aiding and abetting were correct. The only question raised by defendant Nefstad is whether the trial court's instructions adequately stated the law.

The focus of defendant Nefstad's argument on appeal is that the jurors should have been instructed that his mere presence at the scene of the crime or his mere association with a guilty party would have been an insufficient basis for them to find him guilty on an aiding and abetting theory. Defendant Nefstad's requested instructions, however, stated merely the converse of the instructions that were given: under the court's instructions defendant Nefstad could not have been found guilty on an aiding-and-abetting theory unless the jury found beyond a reasonable doubt that he, with intent to promote or make easier the crimes charged, encouraged, procured, advised, or assisted by act or advice the planning or the commission the crimes alleged. If the jury had concluded that defendant Nefstad merely had been present at the scene of the murder or merely had associated with defendant Miranda, it could not have found defendant Nefstad criminally liable on an aiding-and-abetting theory under the court's instructions. Whether the evidence was sufficient to show that defendant Nefstad encouraged, procured, assisted, or advised defendant Miranda in the commission of the crimes charged was a matter that could have been argued to the jury. Thus, no instruction by the trial court on mere knowledge or acquiescence (instruction no. 4), mere presence (instruction no. 6), or mere

association (instruction no. 5) was required. *See State v. Stilling,* 285 Or 293, 304-05, 590 P2d 1223, *cert den* 444 US 880 (1979) ("significance of flight should be left to argument"); *State v. McCormick,* 280 Or 417, 421, 571 P2d 499 (1977) (significance of flight "can in most cases be left to argument by the parties").

## ASSIGNMENT OF ERROR NO. 15

The issue is whether the trial court correctly refused to give defendant Nefstad's requested guilt phase jury instruction no. 11 regarding evidence of "false explanations" as showing "consciousness of guilt."

During the guilt phase, the state introduced evidence of certain false statements defendant Nefstad made to investigating police officers. When first questioned concerning the murder, defendant Nefstad identified himself to the police as Steve Johnson, and he gave the police the wrong year for his birth date; defendant Nefstad falsely stated that he had not met defendant Miranda until March 14, 1987, the day after the murder of Steven Jackson; and defendant Nefstad insisted that he had seen Miranda drive only a blue van and not the Plymouth Satellite in which Jackson was murdered. Later, when defendant Nefstad ultimately was arrested, he repeated the falsehood concerning the vehicle defendant Miranda drove, and defendant Nefstad falsely stated that he had never been in the Acropolis Tavern where Jackson was last seen alive.

In closing argument, the state noted these falsehoods, suggesting that they demonstrated defendant Nefstad's consciousness of guilt. In response, in his closing argument, defendant Nefstad's counsel maintained that the false statements did *not constitute* "affirmative proof" that defendant Nefstad was guilty.

Defendant Nefstad requested the following instruction:

"Evidence of false explanations by defendant is admissible to show consciousness of guilt. Consciousness of guilt, however, does not constitute affirmative proof as to how the crime was committed or defendant's participation therein."

The trial court did not give the instruction and defendant Nefstad excepted.

Defendant Nefstad's requested instruction is phrased in language taken from the Court of Appeals opinion *State v. Voit/Strong,* 12 Or App 520, 532-33, 506 P2d 734 (1973). Defendant's argument in support of his instruction appears to be that, because his paraphrase of the opinion is accurate, therefore, the instruction had to be given. This is poor logic. Defendant's quote from *State v. Voit/Strong* is accurate, but it does not follow that every quote from every opinion should become a required jury instruction.[16] *See State v. Francis,* 284 Or 621, 626, 588 P2d 611 (1978) (instruction based on evidentiary statute is not required).

The trial court's obligation, in instructing the jurors, is to "state to them all matters of law necessary for their information in giving their verdict." ORCP 59B. The significance of a defendant's false statements to the police is not a matter of law that the court must explain for the jury. Instead, the import of lies made to the police is a matter that "can in most cases be left to argument by the parties." *State v. McCormick,* 280 Or 417, 421, 571 P2d 499 (1977). In *McCormick* the trial court refused to give the defendant's requested instruction regarding another potential suspect's flight from the authorities. This court affirmed, observing that the significance of flight could be debated in jury argument "unless the trial court believes in the particular case that the issue should be clarified for the jury." 280 Or at 421. The significance of a suspect's lies to the police is no more obscure than the meaning of his flight from them. Neither matter requires the court's explication. *See also State v. Stilling, supra,* 285 Or at 304-05 (the "significance of flight should be left to argument").[17]

Defendant Nefstad's instruction deals with the inferences that, in defendant's view, may or may not be drawn

---

[16] *State v. Voit/Strong* does not discuss jury instructions. The sole issue in that case was the sufficiency of the evidence. Defendant Nefstad does not challenge the sufficiency of the evidence to support his conviction except with respect to the evidence concerning jurisdiction and venue (assignments of error nos. 4 and 5).

[17] In *State of Oregon v. Kader,* 201 Or 300, 334-36, 270 P2d 160 (1954), which antedates both *State v. McCormick* and *State v. Stilling,* and which is not cited by defendant, this court affirmed even though the trial court had given an instruction regarding "consciousness of guilt." Nonetheless, although giving an instruction may not constitute reversible error, that does not suggest that the instruction is required. In *State v. McCormick,* 280 Or at 420, this court noted that, while "decisions [may] hold that it is not error to give a[n] * * * instruction in a proper case, * * * *this is not the same as holding that [a party] is entitled to it.*" (Emphasis added.)

from his lies. Yet this court has emphasized that "[i]t is the task of the advocate, not the judge, to comment on inferences. * * * Inferences when used against the defendant [in a criminal case] should be left to argument without any instruction." *State v. Rainey,* 298 Or 459, 467, 693 P2d 635 (1985). In this case, because the parties fully presented their differing interpretations of defendant Nefstad's falsehoods to the jury,[18] no instruction was required.

## ASSIGNMENT OF ERROR NO. 16

The issue is whether during the guilt phase the trial court properly admitted Larry Hill's testimony that, while he was at the Acropolis Tavern, he noticed defendant Nefstad because defendant had a "wild look" and because he looked "sleazy."

During the guilt phase of the trial, the Prosecutor questioned state's witness Larry Hill, one of Jackson' co-workers, as follows:

"[Prosecutor:] Now, was there anything that you recognized about one of the people as they stood up next to Mr. Jackson?

"[Hill:] They appeared as though they were leaving, I took it for granted that they were because Steve [Jackson] was putting his jacket on, and they all turned around and walked toward the rear door all at the same time.

"Q. Was there anything that you recognized concerning the Defendant, Nefstad?

"A. Yes, his beard, and he had a blue, I believe it was, a jean jacket on at the time.

"Q. Okay. Had you seen him earlier at all?

"A. Yes, I had.

"Q. *And is there anything distinctive about when you saw him earlier that caused you to remember him when he stood up?*

"A. *Yeah, his eyes. He had kind of a wild look.*

---

[18] Defendant Nefstad's jury argument paralleled his requested jury instruction. Defendant told the jury, "Now, the fact that [defendant] lied is not positive affirmative proof that [defendant] was involved in that murder. That is important for you to remember. It shows who has not been honest, but it's not affirmative proof that he did the crimes that he's charged with."

"[Defendant Nefstad's counsel]: Objection. I would object to that and ask that that be stricken.

"THE COURT: I'll overrule the objection. You can go into it further on cross-examination if you think it's not accurate or descriptive." (Emphasis added.)

On cross-examination, defendant Nefstad's counsel extensively questioned Hill about his ability to identify defendant Nefstad as one of the men who had been with Jackson at the Acropolis on the night of Jackson's murder. Defendant attempted to impeach Hill with Hill's statements from a previous hearing. Later, on redirect, the prosecutor questioned Hill further concerning the reasons he had noticed defendant Nefstad at the tavern:

"[Prosecutor:] *Had you taken any special notice of him, and, if so, please describe.*

"[Hill:] *Yes. He caught my attention. We were standing up by the stage. We noticed he was standing on the other side giving one of the dancers a tip, a dollar bill, and I made a comment about how, you know, like sleezy* [sic] *this guy is.*

"[Defendant Nefstad's counsel:] Your Honor, I would object to that. I would ask that the jury be instructed to disregard it.

"I would also ask the Court to caution [the prosecutor] about trying to elicit that type of testimony.

"THE COURT: I will overrule the objection and simply instruct the jury that the *only significance of any of this is whether or not someone was noted, not the merits of their comments. That has nothing to do with any issue in the case.*" (Emphasis added.)

■ Defendant contends that the court improperly permitted Hill "to characterize defendant as a 'sleazy' person with a 'wild look in his eyes.' "[19] Defendant apparently has plucked the word "character" from "characterize" — a term of his own choosing — and concluded that Hill's testimony was inadmissible character evidence. *See* OEC 404. The challenged evidence, however, was not character evidence.

Character evidence is not defined by OEC 404 or the legislative commentary to OEC 404. This court has observed

---

[19] Hill actually testified that he remembered defendant Nefstad's eyes and that defendant had a wild look.

that, as applied to OEC 404(3), character refers to one's disposition or propensity to commit certain crimes, wrongs, or acts. *State v. Johns,* 301 Or 535, 550, 725 P2d 312 (1986). This is consistent with Professor Kirkpatrick's more general observation that:

> "Character is usually thought to mean a person's disposition or propensity to engage or not to engage in certain types of behavior. Peaceableness, truthfulness, and recklessness would all be examples of traits of character. * * *
>
> "The rationale for generally excluding evidence of character is that it may tend to divert the attention of the jury from what a person did on a specific occasion to what that person has done in the past." Kirkpatrick, Oregon Evidence 139 (2d ed 1989).

Professor McCormick has defined character as "a general description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness." McCormick, Evidence 574, § 195 (3d ed 1984). *See also United States v. Holman,* 680 F2d 1340 (11th Cir 1982) (adopting McCormick's definition of character).

Neither the prosecutor's question nor Hill's description of defendant Nefstad in response suggested anything concerning defendant's propensity to engage in certain kinds of behavior, his disposition, or his general personality traits. Rather, the inquiry concerned only the reason for Hill's ability to recognize defendant as someone with whom Jackson had left the Acropolis. Hill was able to recognize and remember defendant Nefstad because of defendant's eyes and wild look; Hill also remembered remarking that defendant Nefstad looked sleazy when Hill noticed defendant giving a dancer a one dollar tip.

The testimony was not character evidence under OEC 404(1) or (2), nor was it uncharged misconduct evidence under OEC 404(3). The trial court recognized that Hill's testimony was not character evidence and that it was not governed by OEC 404, and properly overruled defendant's objection.

■ Implicit in defendant Nefstad's argument is the contention that Hill's testimony was not relevant to the determination of defendant Nefstad's guilt and that, if it was, its relevance was outweighed by the danger of unfair prejudice.

The fact that Hill took particular notice of defendant, however, was highly relevant.[20]

Hill's ability to identify defendant Nefstad was crucial to the state's case. Jackson last was seen alive at the Acropolis Tavern. Apparently, there were no eyewitnesses to Jackson's murder other than the perpetrators. Hill last saw Jackson talking to and then leaving with two men; Hill had never seen either of the two men before. Hill's ability to identify one of those men as defendant Nefstad was critical, not only because that identification linked defendant Nefstad to Jackson's disappearance, but more importantly because it was the link (other than defendant Miranda's guilt phase testimony) that put defendant Nefstad and Jackson together with defendant Miranda outside the tavern.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *." OEC 403. Where the evidence has probative value, the trial court is allowed latitude in deciding whether the unfairly detrimental aspect of the testimony outweighs its probative value.

The commentary to OEC 403 defines unfair prejudice as:

"an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one. In deciding whether to exclude on grounds of unfair prejudice, the court should consider the probable effectiveness of a limiting instruction."

Of course, to the extent that Hill's testimony identified defendant Nefstad as the last person with whom Jackson was seen while he still was alive, the testimony was relevant to prove defendant Nefstad's guilt. Plainly, the fact that Hill's testimony was relevant to the ultimate issue of defendant Nefstad's guilt did not make it inadmissible; it was inadmissible only if its probative value was outweighed substantially by the danger of unfair prejudice.

The danger that the jury would have found defendant

---

[20] Hill also testified that defendant Nefstad was wearing a "blue jean jacket" when he left with Jackson. That description of defendant's appearance had direct relevance to other evidence establishing his guilt. (See assignment of error no. 11, *ante.*)

Nefstad guilty of aggravated murder and, in effect, have condemned him to death on the basis that he had a wild look and looked sleazy when he tipped a nude dancer is infinitessimally slight, especially given the trial court's instruction. The danger of unfair prejudice did not substantially outweigh the probative value of Hill's testimony. The trial court properly ruled it was admissible.

## ASSIGNMENT OF ERROR NO. 17

The issue is whether the trial court properly overruled defendant Nefstad's objection, made during the prosecutor's cross-examination of defendant Miranda during the guilt phase, to a question concerning an inquiry made by a police officer while she was interviewing defendant Miranda.

During his direct examination, defendant Miranda admitted that, when arrested, he told the police that he had been with a "black guy" on the night of Steven Jackson's murder. He claimed that he had concealed Nefstad's identity from the police because he was "somewhat" concerned about his personal safety. He also said that he did not really remember what he told the police the night of his arrest and that he "was giving [the] police a story, so to speak."

On cross-examination, the prosecutor elicited further details from defendant Miranda concerning the statements that he had made to the police about the black man. During the course of this cross-examination, defendant Miranda was asked if he recalled detective Hill telling him "that she felt she knew the identity of the second person involved in the stabbing; that it was not a black man." Defendant Nefstad objected to this question, arguing that it "puts before the jury indirectly that it is the opinion of the police officer that a black male was not the second person who did the killing." The trial court overruled defendant Nefstad's objections.

Defendant Nefstad correctly notes that it is improper for a witness to comment on the guilt or innocence of a suspect, but all of the cases that he cites involved witnesses who directly commented on a defendant's or a possible suspect's guilt or innocence. Here, the prosecutor's question to defendant Miranda was not even an indirect comment on defendant Nefstad's guilt. Moreover, the question was relevant to show that defendant Miranda persisted in lying to the police, even

when confronted with the officer's statement. Because the prosecutor's question was relevant to impeach Miranda's credibility and because the question was not a comment on Nefstad's guilt, the trial court properly allowed such inquiry.

## ASSIGNMENT OF ERROR NO. 18

The issue is whether the trial court correctly overruled defendant Nefstad's objection to a police officer's testimony, during the guilt phase, that she had broadcast over the police radio that she had probable cause to arrest defendant Nefstad.

Detective Hill testified concerning her attempts to find defendant for the purpose of arresting him. During this testimony, the following occurred:

"[Prosecutor:] During this time had you broadcast any directive or information to other police officers concerning the Defendant, Mr. Nefstad?

"A. Yes, I had broadcast information over the No. 1 Channel, which is the Central Precinct Channel, that there was probable cause to arrest Stephen Nefstad.

"Q. Now, —

"[Defendant Nefstad's Counsel:] I would object to that and ask that it be stricken, your Honor.

"THE COURT: On what grounds?

"[Defendant Nefstad's Counsel:] Well, a conclusion of the witness.

"THE COURT: Obviously, this is a conclusion of the witness, but her conclusion that there was probable cause is not evidence of anything. However, I will permit her to tell you what she did."

Detective Hill then testified that she learned later that evening that defendant Nefstad was at a certain location, and he was arrested there.

Immediately following defendant's objection that Detective Hill's testimony was "a conclusion of the witness," the trial court, while the jury was present, agreed with defendant's counsel that the officer's testimony was an opinion and noted that the officer's conclusion that there was probable cause to arrest defendant "is not evidence of anything." The

court then ruled that it would permit the witness to tell what she did.

Although the trial judge did not expressly sustain defendant's objection to the testimony, his comments amounted to a sustaining of defendant's objection coupled with a cautionary instruction to the jury that the officer's testimony regarding probable cause to arrest was not evidence of anything. The court's prompt comments cured any error. *See State v. Jackson,* 221 Or 315, 323-24, 351 P2d 439 (1960) (prompt curative instruction cured error in admitting evidence of the defendant's offer to compromise); *State v. Folkes,* 174 Or 568, 150 P2d 17, *cert den* 323 US 779 (1944) (capital case; court's instructions cured any error in permitting jury to hear evidence of other misconduct by the defendant).

Defendant further argues that "the combined effect of the two statements [Detective Hill's probable cause to arrest statement and the prosecutor's question to defendant Miranda (assignment of error No. 17)] was that the jury was informed that Detective Hill believed that she knew who was guilty of the murder of Steven Jackson and that defendant was that person." Defendant's "combined effect" argument lacks merit. Neither the prosecutor's question during cross-examination of defendant Miranda nor the officer's testimony concerning probable cause to arrest amounted to a comment on the guilt of either defendant.

### ASSIGNMENTS OF ERROR NOS. 19 - 20

*No. 19:* Whether, during the guilt phase, the trial court correctly allowed the state to introduce a photograph of the victim taken shortly before defendants murdered him.

*No. 20:* Whether, during the guilt phase, the trial court correctly overruled defendant's objection to the prosecutor's suggestion to the jurors during closing arguments that they compare the photograph taken of the victim while he was alive with one taken of his corpse.

During the guilt phase, defendant Nefstad objected to the introduction of a photograph of Jackson that was taken shortly before defendants murdered him. Defendant Nefstad objected on two grounds: (1) that the photograph was irrelevant to defendant Nefstad's guilt and was too prejudicial, and (2) that introduction of the photograph violated the federal

and state constitutions because it "would create a feeling on the part of the jury [that] the victim was a good person or a decent person." The trial court overruled defendant Nefstad's objection:

"THE COURT: I don't think I'll invite argument on this. Frankly, I've always overruled that objection even before the Victims Rights Bill was adopted. It seems to me there can't be anything prejudicial to the Defendants in a picture of a decedent in a murder case. It doesn't prejudice them. It doesn't change the light in which the Defendant is in. It simply shows the jury that the person who is dead is a person and not just a name and not just a body shown in an autopsy or a crime scene photograph.

"* * * * *

"I can't see that there is that [constitutional] ground I can't conceive that it's prejudicial to the Defendants. It's helpful for the State to show the jury that this is a person and not just a body."

At the conclusion of the guilt phase, the prosecutor argued to the jury:

"[Prosecutor:] Ladies and Gentlemen, with all these legaleze [sic] and attorneys arguing, there may be a tendency on your part to forget the true horror of the event that occurred in this state and in this case. Now I am going to ask you to go back to the jury room and I am going to ask you to look at a picture of Steve Jackson as he was when he was alive and then I am going to ask you to look at the exhibits of how he appeared when these men were through with him.

"[Defendant Nefstad's counsel:] I object, Your Honor. It's an improper appeal on emotions. I would object to it.

"[Prosecutor:] Your Honor, I haven't finished my statement.

"THE COURT: Go ahead, please.

"[Prosecutor:] I would ask you to consider whether these men after doing this could really talk back and forth with each other, could really have pleasant exchanges if they had any feelings about what they had done.

"I would ask you to consider —

"THE COURT: I will overrule the objection.

"[Prosecutor:] Thank you, Your Honor.

"I would ask you to consider whether you have noticed in

your evaluation of them in your viewing of them in the courtroom whether they really care at all. And if they don't care about that, then what wouldn't they be willing to try."

The state was entitled to introduce the photograph of Jackson taken while he still was alive pursuant to ORS 41.415, which provides:

"In a prosecution for *any criminal homicide,* a photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive." (Emphasis added.)

Defendant Nefstad contends that ORS 41.415 "should be invalid in death penalty cases because the photograph would automatically become evidence that the jury could consider when deciding the penalty phase of the trial and thus violate defendant's Eighth Amendment rights." Defendant relies exclusively on *Booth v. Maryland,* 482 US 496, 107 S Ct 2529, 96 L Ed 2d 440 (1987), to support his argument. Defendant's reliance on *Booth* is misplaced.

In *Booth,* the court considered "whether the Constitution prohibited a jury from considering a 'victim impact statement' [VIS] during the sentencing phase of a capital murder trial." 96 L Ed 2d at 445. As defendant Nefstad points out, the Court's concern in *Booth* was that the VIS provided information to the jury that was not relevant during the penalty phase of a capital case:

"First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant."

Unlike the VIS in *Booth,* the photograph of Jackson did not depict his personal characteristics or describe the emotional devastation of his family, nor did it indicate Jackson's family members' opinions or characterizations of defendant Nefstad. Defendant's reliance on *Booth* has no merit, and the trial court did not err in admitting the photograph into evidence.

We now turn to the propriety of the prosecutor's comments during closing arguments concerning a comparison of the photographs. In order to prove that defendant was

guilty of aggravated murder beyond a reasonable doubt, the state had to prove that he acted intentionally when he murdered Jackson. ORS 163.095(2)(d). Defendant's state of mind when he murdered Jackson thus was an essential element of the state's case.

As evidenced by the photograph of Jackson taken while he still was alive, Jackson appeared to be in good health and in an uninjured condition just two days before defendants murdered him. The photographs of Jackson's corpse show literally dozens of stab wounds, on his face and on virtually every other part of his body. These photographs obviously were strong evidence that Jackson's murder was committed by defendants with intent. Jackson's condition while he still was alive in contrast to the condition of his corpse directly was relevant to remove any doubt from the minds of the jurors that defendant Nefstad acted with intent when he murdered Jackson.

Again, defendant Nefstad relies solely on *Booth v. Maryland* to support his argument that the prosecutor's argument was an improper appeal to the jurors' emotions; again, defendant's reliance is misplaced. The prosecutor's argument implied nothing about Jackson's personal characteristics or reputation, or about the effect his death had on his family or on society. The prosecutor's argument focused entirely on defendant's state of mind as evidenced by the nature and brutality of the murder. Thus the prosecutor's suggestion to the jurors that they compare the photographs was proper argument on an essential element of the state's case.

## PENALTY PHASE

As this court stated in *State v. Wagner,* 309 Or 5, 786 P2d 93 (1990), consistent with the United States Supreme Court decision in *Penry v. Lynaugh,* 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989), and ORS 163.150, in a death penalty case the trial judge must instruct the jury on a fourth question on the subject of mitigation, if constitutionally required. The trial court did not give such an instruction. The holding in *Wagner* requires that this case be remanded to the trial court for retrial of the penalty phase only, consistent with the procedures set forth in that opinion.

Pursuant to this court's opinion in *Wagner,* in the penalty phase the trial court must instruct each juror on the four issues set forth in ORS 163.150(1)(b), which statutory instructions may (but need not) read as follows:

1. Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the

reasonable expectation that death of the deceased or another would result?

2. Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? In determining this issue, you shall consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

(If raised by the evidence) 3. Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

4. Should defendant receive a death sentence? You should answer this question "no" if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death.

As stated in *Wagner,* in the fourth question proposed above we are asking the jury to consider any mitigating aspect of defendant's life, alone or in combination, not necessarily related causally to the offense, in making its finding. 309 Or at 19-20. *See also Boyde v. California,* (58 USLW 4301) ___ US ___, ___ S Ct ___, ___ L Ed 2d ___ (Mar. 5, 1990).

 If any juror votes "no" on any of the four questions, the death penalty may not be imposed, because a sentence of death by a jury must be unanimous. Acceptable instructions relating to evidence and proof of mitigating circumstances are set out in *State v. Farrar,* 309 Or 132, 786 P2d 161 (1990).

Any assignments of error not discussed have been considered and are either moot or without merit.

The judgment is affirmed as to the guilt phase and reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion.

**FADELEY, J.,** dissenting.

I dissent for the reasons stated in the dissenting opinions in *State v. Moen,* 309 Or 45, 786 P2d 111 (1990) and *State v. Wagner (II),* 309 Or 5, 786 P2d 93 (1990). I believe the court should assess and fix final punishment now under the statute rather than sending this case back to the trial court for a

further penalty phase trial which will lead to further delay and may lead to further appeals costly to the public.