Argued and submitted October 19, 2017, affirmed December 11, 2019, petition for review denied May 7, 2020 (366 Or 451)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEPHEN LEROY NEFSTAD,
*Defendant-Appellant.*

Multnomah County Circuit Court
870331733; A161053

456 P3d 294

Defendant appeals an order denying his motion for a new trial. Defendant was found guilty of aggravated murder in 1987. Following his conviction, defendant obtained a court order directing police to conduct DNA testing of the jacket and boots that were used as circumstantial evidence to convict him. According to defendant, the DNA testing results were "exculpatory" in the sense that they were "favorable" to his case, and he was therefore entitled to file a motion for a new trial under ORS 138.696 (2013). The state disagrees, arguing that defendant misinterprets the term "exculpatory" and that, even under defendant's definition, the results did not entitle him to a new trial. *Held*: The trial court did not err in denying defendant's motion for a new trial. Even assuming that "exculpatory" means that the results are merely "favorable," the results in this case did not meet that threshold.

Affirmed.

Julie E. Frantz, Judge.

Lindsey Burrows, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Lindsey Burrows and O'Connor Weber LLC filed the reply brief.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Powers, Judge, and Mooney, Judge.*

_____

* Mooney, J., *vice* Garrett, J. pro tempore.

ORTEGA, P. J.

Affirmed.

**ORTEGA, P. J.**

Defendant was found guilty of aggravated murder in 1987. At his trial, a criminalist for the state testified, based on chemical tests, that human blood was found on defendant's jacket and boots. The jacket was believed to be the jacket that defendant was wearing when he left a tavern with the victim. Defendant eventually sought and obtained a court order directing police to conduct DNA testing of the jacket and boots with methods that were not used at the time of the trial. This appeal concerns the results of that testing. According to defendant, the results were "exculpatory" in the sense that they were "favorable" to his case, and he was therefore entitled to file a motion for a new trial under ORS 138.696 (2013).[1] The state disagrees, arguing that defendant misinterprets the term "exculpatory" but that, even under defendant's definition, the results did not entitle him to a new trial. For the reasons explained below, we agree with the state's latter argument: Even assuming that "exculpatory" means that the results are merely "favorable," the results in this case did not meet that threshold. We therefore affirm the trial court's order denying defendant's motion for a new trial.

## I.   UNDERLYING TRIAL

We begin by providing the historical facts from the criminal trial, which are taken from *State v. Nefstad*, 309 Or 523, 789 P2d 1326 (1990), and supplemented with undisputed facts from the record.

"Shortly after midnight on Friday, March 13, 1987, defendant Stephen Leroy Nefstad and co-defendant Reyes Miranda drove to the Acropolis Tavern in Portland. There defendant struck up a conversation with the victim, Steven A. Jackson. At about 1:45 a.m., Jackson told his companions 'that he would be right back' and then stepped outside the tavern with defendant and Miranda. Jackson was never seen alive again.

---

[1] The statutes governing post-conviction DNA testing were amended in 2015 and 2019. Or Laws 2015, ch 564; Or Laws 2019, ch 368. Because the 2015 amendments did not go into effect until January 1, 2016, all references to the post-conviction DNA statutes are to the version in effect at the time of the trial court's ruling in November 2015.

"A few miles away from the tavern at 2:37 a.m., [co-defendant] Miranda used Jackson's automatic teller bank card to withdraw $200 from Jackson's account. Sometime during this period, Jackson was brutally murdered by repeated stab wounds to his chest, and his body was left off of a dead-end street. The front passenger area of Miranda's vehicle was covered with blood; Miranda's clothes were soaked with blood, and defendant also had blood on his clothes.

"Defendant stated to his friends that 'something heavy had gone down. That they [defendant and Miranda] had to take this guy out. That he was history.' Miranda admitted that after the stabbing, his car looked like 'Psycho III.' When the police took defendant in for questioning, defendant identified himself as 'Johnson' and gave a false date-of-birth. He told the police that 'he didn't know anything about the homicide.' Defendant told the officers an exculpatory story. The jury, however, found that he and Miranda had killed Jackson."

*Nefstad*, 309 Or at 525 (second brackets in original).

During the trial, there was no forensic evidence connecting defendant to the car or murder. Some weeks after the murder, the state seized, among other evidence, defendant's jean jacket and a pair of boots. A witness testified that defendant was wearing a jean jacket when he was seen leaving the Acropolis Tavern with Jackson. *Nefstad*, 309 Or 555 n 20. At trial, criminalist Beth Carpenter testified that she had identified a "small amount" of what testing confirmed was human blood on the boots. Carpenter also testified that there were several areas of what testing confirmed was human blood on the jacket. As relevant to this appeal, Carpenter testified that one of those locations was the "outside of the left arm, elbow area." Carpenter testified that she was unable to determine through chemical testing whose blood was on defendant's jacket or boots. *Nefstad*, 309 Or at 544.

Carpenter also testified that she was unable to determine, "[f]rom a scientific point of view," whether the jacket was in the car at the time of the murder, but she opined that,

"Assuming that this jacket was in the car when * * * Jackson was killed, I believe it was worn by an individual who had his arm, his left arm, around the neck of * * * Jackson, possibly and probably in the back seat."

*Id.* at 544-45 (brackets in original).

Defendant was convicted of aggravated murder and sentenced to death. *Id.* at 525. The Supreme Court affirmed the conviction, but it reversed and remanded the case for resentencing. *Id.*

## II.  MOTION FOR DNA TESTING AND MOTION FOR NEW TRIAL

To provide context to the parties' arguments, we begin by discussing the applicable law. A person who is incarcerated after a conviction for aggravated murder may file a motion in the original criminal case requesting DNA testing of certain evidence obtained at the time of the original prosecution that resulted in the conviction. ORS 138.690; ORS 138.692. The person filing a motion under ORS 138.690 must also submit an affidavit that includes, among other information, a statement that the person is "innocent of the offense for which the person was convicted." ORS 138.692 (A)(ii). The person requesting the testing "must present a prima facie showing that the DNA testing of the specified evidence would, assuming exculpatory results, establish the actual innocence of the person[.]" ORS 138.692(1)(b). If the court orders the specified evidence to be tested, ORS 138.696 allows the person to file a motion requesting a new trial if the court concludes that the DNA results are "exculpatory." Specifically, ORS 138.696 provides:

"(1)  If DNA (deoxyribonucleic acid) testing ordered under ORS 138.692 produces inconclusive evidence or evidence that is unfavorable to the person requesting the testing:

"(a)  The court shall forward the results to the State Board of Parole and Post-Prison Supervision; and

"(b)  The Department of State Police shall compare the evidence to DNA evidence from unsolved crimes in the Combined DNA Index System.

"(2)   If DNA testing ordered under ORS 138.692 pro-
duces exculpatory evidence, the person who requested the
testing may file in the court that ordered the testing a
motion for a new trial based on newly discovered evidence."

Turning back to the facts of this case, on December 11,
2001, the same year that the Oregon legislature passed the
state's first DNA-post-conviction statute, defendant filed a
motion requesting that certain evidence seized at the time
of his prosecution be tested for DNA. For reasons not related
to this appeal, the hearing on defendant's motion was not
held until July 2014.[2]

At the hearing, defendant requested, as relevant to
this appeal, that the jean jacket and boots that Carpenter
tested at the time of his trial be tested for DNA. In determin-
ing whether to grant defendant's motion and order the DNA
testing, one of the contested issues before the trial court
was the probative value of testing the jacket due to the risk
that the jacket had been contaminated. After defendant's
trial, his jacket had been stored for over 20 years together
with Miranda's and Jackson's bloody clothing. Both parties
agreed that there was a risk of contamination. Ultimately,
the court granted defendant's motion and ordered the test-
ing of the jacket and boots.[3]

Following the results of the DNA testing, the state
filed a "State's Notice of DNA Testing Results and Motion
for Finding of 'Unfavorable' Evidence." Defendant responded
by filing his objection to the state's motion and subsequently
filed a motion for a new trial. The court held a hearing on
both motions.

At this point, we give only a brief summary of the
results because we provide a more detailed account below.
The results from the boots identified the presence of blood in

---

[2] For reasons also not relevant to this appeal, defendant ultimately filed a
total of five motions requesting a court order for DNA testing.

[3] The trial court also ordered the testing of "[a]ny frozen blood swabs" taken
from defendant's boots. Carpenter had created a liquid extract of blood taken
from defendant's boot, which had been stored in a freezer following defendant's
trial. There was no DNA profile obtained from the extract, which defendant con-
cedes on appeal is an inconclusive test result. Because the testing results from
the extract do not form the basis of the issues raised on appeal, we focus our
discussion and analysis only on the testing results from the jacket and boots.

several areas. Additionally, DNA from at least two contributors, including defendant, was recovered from the boots. However, partially due to the low levels of DNA recovered, no conclusions could be drawn regarding the identity of the contributors of the DNA. Similarly, the jacket tested positive for the presence of blood in multiple locations. However, unlike the boots, Jackson's DNA was located on the jacket. And, although the testing showed that contamination of the jacket was possible, evidence was presented that it was more probable that Jackson's DNA in one location of the jacket, the left elbow area, was deposited at the time of the murder and not the result of contamination.

The trial court issued a written order detailing its factual findings and legal conclusions, which we also address in more detail below. The trial court found that the results from the boots were "inconclusive" because the testing of the boots "did not generate useable DNA profile results." The court also found that, because Jackson's DNA profile was located on the jacket, including the left elbow area, which was "consistent with the state's theory [that defendant] wrapped his left arm in that sleeve around the neck of *** Jackson to hold him in place while *** Reyes repeatedly stabbed *** Jackson in the front seat," the results "link [defendant] to the crime scene" and were not exculpatory. The court then denied defendant's motion for a new trial based on those findings.

## III.   ANALYSIS

On appeal, defendant argues that the court erred in concluding that the DNA results were not exculpatory and in denying his motion for a new trial. Defendant first begins by arguing that the legislature intended the word "exculpatory" in ORS 138.696 to mean that the DNA results must be "favorable." Defendant contends that "'exculpatory' is a legal term of art regularly applied to evidence in the context of *Brady v. Maryland*, 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963)." And, under *Brady*, evidence is exculpatory if it is "favorable to an accused." *Brady*, 373 US at 87. Defendant argues that the dictionary definition supports that interpretation because it establishes that the plain meaning of "exculpatory" is "'*tending* to exculpate,' which, in turn, means 'to

clear from alleged fault or guilt.'" (Quoting *Webster's Third New Int'l Dictionary* 794 (unabridged ed 2002) (emphasis in defendant's brief)). Lastly, defendant argues that, in assessing whether the results are favorable, the legislative history supports that the results must be viewed in light of the facts of the case.

The state disputes defendant's definition of "exculpatory." The state argues that "exculpatory" for purposes of ORS 138.696 requires DNA test results to demonstrate defendant's actual innocence. However, the state contends that, even applying the "favorable" standard, defendant's arguments fail because defendant's arguments are premised on factual assertions that the trial court rejected.

We agree with the state that we need not decide whether defendant's definition of "exculpatory" for purposes of ORS 138.696 is correct because we conclude that, even applying defendant's definition, the DNA results from the boots and the jacket are not favorable—that is, the results do not tend to exculpate defendant. We discuss the results from the jacket and the boots, in turn, below.

We review for errors of law the court's legal conclusion that the DNA results were not "exculpatory" based on its interpretation of ORS 138.696. *See State v. Cadigan*, 212 Or App 686, 690, 159 P3d 348, *rev den*, 343 Or 223 (2007). On review for errors of law, a trial court's findings of fact are binding on appeal if there is evidence in the record to support them. *Ball v. Gladen*, 250 Or 485, 487, 443 P2d 621 (1968).

A.   *DNA Results from the Jacket*

Because Jackson's DNA was located on the jacket, we begin there. Defendant's argument that the results from the jacket are exculpatory misstates the test results and incorrectly concludes that they were favorable to him. Chrystal Bell and Marla Kaplan, forensic scientists with the Oregon State Police Forensic Services Division, testified at the hearing and explained the testing results. Bell conducted preliminary testing of the jacket and boots to determine the presumptive presence of blood. Kaplan subsequently performed the DNA testing. Bell explained that she

and Kaplan devised an analytical approach to test the jacket to account for the risk of contamination. Their approach was to test the locations of the jacket where Carpenter had previously located blood. Carpenter had cut squares from the jacket and tested those individual squares for blood. Because Carpenter's original cuttings were either lost or destroyed, Bell tested the areas immediately adjacent to those squares.

Carpenter had tested seven areas of the jacket, and four of those areas tested positive for the presence of blood using phenolphthalein, a chemical compound used to detect blood. Carpenter had created two separate drawings to document her testing from the cuttings, one reflecting the front of the jacket and the other reflecting the back. Carpenter indicated that the four areas that had tested positive for blood were all located on the front of the jacket. On the back of the jacket, Carpenter noted the two areas that she had tested were negative. Carpenter also tested the jacket for the presence of blood using luminol, and the results returned a void on the back of the jacket, indicating no blood was detected.

As particularly relevant to this appeal, one of the areas that Bell tested was the outer edge of Carpenter's cutting on the left sleeve or elbow. Carpenter noted this area as "A" on both her front and back sketches. On Carpenter's front sketch, she noted that area A returned a positive blood result. On her back sketch, Carpenter omitted any positive or negative notation next to A. Bell explained that

"[Area] A *** on [Carpenter's] sketches *** is shown on both the front and on her sketch on the back. Now, we know that as a jacket or a shirt is worn, if you lay it down, there's a front side and a back side. But as worn, you can have staining that's extending onto both areas."

Bell thus concluded that Carpenter's notation of area A on the front and back of her sketches appear to be "an extension of the same stain." Kaplan agreed with Bell's conclusion that area A on the front and back of Carpenter's sketches were a "single stain" due to the three-dimensional nature of the jacket.

Bell took a cutting, labelling it "Ex 1.1," from the threaded area where Carpenter's cutting of area A had

been. Bell's notes indicated that the location of area A and Ex 1.1 on the jacket was the "back left sleeve." We provide an appendix that includes a photo of the front and back of the jacket taken by Bell.[4] Bell testified that she took a cutting immediately below Carpenter's cutting, "from an extension of the hole that *** Carpenter had originally made." Ex 1.1 came back presumptively positive for the presence of blood.

Bell also conducted a visual examination of the jacket to attempt to identify possible blood stains. Bell observed a "diffuse, light brown" stain in area A, but she was unable to determine whether the stain was a primary blood stain or blood deposited in another way, or some other soiling. Bell could not determine from Carpenter's notes whether and the extent to which Carpenter had observed blood staining.

Kaplan then conducted DNA testing by cutting pieces from the centers of the cuttings that she had obtained from Bell. Kaplan explained that she and Bell decided to actually test the cotton fibers of the jacket for DNA as opposed to just swabbing the surface because cotton fibers are absorbent, and the goal was to capture the genetic material from the blood that may have been trapped within the fibers in 1987.

Kaplan's testing results from Ex 1.1 revealed the partial DNA profile of a single person—Jackson. The estimated frequency of the DNA profile is less than 1 in 10 billion in the Caucasian, African American, and Hispanic populations. Kaplan explained that a "partial profile" means that the DNA is not "fully resolved" at all 32 possible locations in which DNA can be found. Kaplan testified that partial DNA profiles produce interpretable results and are commonly relied on in the field of forensic science.[5]

---

[4] The photo includes Bell's notes indicating the areas on the jacket where Carpenter had tested, including some areas not addressed in this opinion. We focus only on the results from the jacket that are relevant to this appeal.

[5] Jackson's DNA was also located in two areas on the collar of the jacket. Carpenter's drawing noted that blood was detected in two areas on the collar, areas B and G, in 1987. Bell labelled area B as "Ex 1.2," and area G as "Ex 1.4." For area B, Ex 1.2, Bell was unable to locate exactly where Carpenter sampled from, so her sample was taken from the "lower collar/placket." For area G, Ex 1.4, Bell cut from the margin of the hole that Carpenter had previously cut. Both

Kaplan acknowledged that she obtained one-fifth the optimum level of DNA from Ex 1.1, which is considered a low-level result, but noted that such levels are "a very routine amount of DNA that is often tested *** in criminal cases," are "not in any way unusual," and are scientifically reliable.

Both Bell and Kaplan acknowledged that contamination—the transfer of DNA from Jackson's or Miranda's clothing to defendant's jacket—was possible. To assess the presence and extent of contamination, Bell swabbed the surface of the jacket and then tested the swabs for the presence of blood. Bell labelled those swabs "Ex 1.5." As a result of the swabbing, blood was detected in all of the areas tested, including those areas where Carpenter had not previously detected blood. Kaplan subsequently conducted DNA testing of those swabs, and they returned "mixtures of at least two individuals at a level that was so low that [Kaplan] was unable to make any conclusive determinations about the donors of *** those DNA mixtures." Kaplan testified that the mixture of DNA from Ex 1.5 may be the result of contamination from the commingling of defendant's clothes with Jackson's and Miranda's clothing.

Kaplan explained the relative significance of identifying a single profile in Ex 1.1 and a low-level mixture of DNA in Ex 1.5. She noted that, if Ex 1.1 had returned a mixture of DNA profiles, she "would have no way to discuss [it], to contextualize that result because of the known commingling." Kaplan continued,

"However, in this instance, because I did obtain just that single source DNA profile, I'm *** left to question ***

returned partial DNA profiles matching Jackson's. The estimated frequency of the DNA profile from a randomly selected individual in these samples was higher than for the sample in Ex 1.1 (Ex 1.2: 1 in 60.0 million in the Caucasian population, 1 in 1.09 billion in the African American population, and 1 in 755 million in the Hispanic population; Ex 1.4: 1 in 8,330 in the Caucasian population, 1 in 109,000 in the African American population, and 1 in 43,100 in the Hispanic population). Kaplan and Bell were not asked to and did not provide an opinion as to whether the blood located in those areas was more or less likely to have been deposited in 1987 or the result of contamination. Although the court's written order did note the results in Ex 1.4, the court relied most heavily on the results from Ex 1.1 in its findings. Therefore, because of the court's primary reliance on Ex 1.1, and because the results from Ex 1.4 and Ex 1.2 would not affect the outcome in this case, we focus our analysis on the results from Ex 1.1.

from a DNA analysis and scientific standpoint, then what happened to the DNA—to the blood that [Carpenter] found in 1987, because I found no evidence of anyone else's DNA in that same area."

Kaplan thus concluded that the test results of Ex 1.1 are "less likely the results of contamination than *** of *** Jackson's blood" deposited in 1987. For the same reason, Bell likewise concluded that it is "more probable that the blood [she] detected and sampled [in Ex 1.1] was blood deposited in 1987."

On appeal, as he did before the trial court, defendant argues that the testing results from the jacket are exculpatory. He first contends that the testing "revealed the presence of multiple DNA profiles, which refutes the state's trial theory" that the blood on the jacket must have been Jackson's. Defendant contests the court's findings that it was more probable that the blood on the elbow (Ex 1.1), which tested positive for Jackson's DNA, was deposited at the time of the murder. He argues that "[t]hat conclusion wholly depends on a single premise: that Bell and Kaplan tested the *same area* in which Carpenter originally found blood," which defendant contends "is unsupported by the record." (Emphasis in original.) He argues that Kaplan and Bell could not have tested the same area as Carpenter because the squares Carpenter tested had been lost or destroyed.

According to defendant, Ex 1.1 "likely revealed the victim's DNA in an area where Carpenter originally obtained a *negative* result." (Emphasis in original.) As support for that position, defendant argues that Carpenter's cuttings from the back of jacket and the luminol testing all reveal that there was no blood on the back of the jacket. Defendant acknowledges that "Area A, from which Ex 1.1 was taken, included portions of both the front and the back of the jacket," but concludes that Carpenter only identified blood on the front of the jacket. And, because Bell's cutting came from the back of the jacket, Bell's cutting did not come from the same area where Carpenter had detected blood on the left sleeve. Thus, defendant argues, Jackson's blood on the left sleeve is the result of contamination and that, combined with the results identifying multiple contributors

elsewhere on the jacket, is favorable because it shows that the blood on defendant's jacket may have come from a source other than Jackson, undermining the state's trial theory.

As it did before the trial court, the state disagrees. The state notes that it is undisputed that Jackson's blood was located on the jacket. Further, the state argues, the trial court found as fact that Jackson's blood on the back-left sleeve was located in the same area in which Carpenter had detected human blood in 1987, which linked defendant to the crime scene, and that defendant's challenge to that factual finding ignores our standard of review.

Refuting defendant's specific challenges to the court's factual findings, the state argues that defendant's claim that Bell and Kaplan located Jackson's blood in a location that Carpenter had previously determined lacked human blood is based on defendant's own interpretation of Carpenter's handwritten notes to the exclusion of Carpenter's testimony and other evidence. The state first points to Carpenter's testimony at trial, stating that she found human blood on the "'outside of the left elbow area.'" The state argues that "[n]othing about that testimony suggests that the human blood on the elbow was confined to the 'front' of the sleeve, as opposed to covering the elbow, three-dimensionally, front to back." Further, the state points to a photo taken by Bell that shows a two-dimensional view of the back of the jacket and notes that the original hole that Carpenter cut, as reflected in the photo, is in fact located on the back of the jacket.

The state also argues that defendant misunderstands the scientists' testimony and the trial court's factual findings regarding the background DNA testing of the jacket, which identified a mixture of at least two contributors. The background DNA testing, the state contends, represents the extent of potential contamination, explaining, "[P]laces on the jacket where there is no dispute that blood did not previously exist, Kaplan and Bell discovered blood from multiple contributors. Yet, in the exact location where Carpenter *did* detect the presence of blood—the left sleeve—there was only one contributor: the victim." (Emphasis in original.) Thus, the state argues, the court's finding that it

was more probable that Jackson's blood was deposited at the time of the murder is supported by the record and is binding on appeal. We agree with the state.

Defendant's argument that the jacket evidence is favorable hinges on his theory that Jackson's DNA that was located on the left sleeve was a result of contamination and was not deposited at the time of the murder. As the state notes, the challenge for defendant is that defendant's argument is premised on a challenge to the trial court's factual findings, which we are bound to follow if any evidence in the record supports them. *Ball*, 250 Or at 487. And, because there is evidence in the record to support the trial court's factual findings, we conclude that the trial court did not err in finding the results were not exculpatory.

First, the court found as fact that Bell's Ex 1.1 cutting came from the same location on the jacket as Carpenter's area A—the factual premise underlying Bell and Kaplan's conclusions that it was more probable that the blood on the left sleeve was deposited in 1987. In its written order, the trial court stated that Bell had taken cuttings from the "four areas where *** Carpenter['s] *** testing revealed the presumptive presence of blood," including the "back left sleeve." That finding is supported by the record. Bell explained that she obtained the cuttings for Ex 1.1 by cutting immediately below the hole that Carpenter had cut, which included the threaded area of Carpenter's hole. Bell's cutting of Ex 1.1 was a cutting "from an extension of the hole that *** Carpenter had originally made." The trial court relied on that testimony in its written order. Additionally, the two-dimensional photo of the jacket that is provided in the appendix shows that Carpenter's cutting was in fact located on the back of the jacket.

Defendant contests that factual finding by arguing that Bell's cutting actually came from an area that Carpenter either had not tested for blood or which tested negative based on Carpenter's omission of a positive or negative note on the two-dimensional sketch that she created of the back of defendant's jacket. Although defendant presents alternative arguments as to how Carpenter's notes should be interpreted, our standard of review does not allow us to

"reweigh the evidence or speculate whether the evidence might have supported other factual findings than those made." *Pratt v. Armenakis*, 201 Or App 217, 220, 118 P3d 821 (2005), *rev den*, 340 Or 483 (2006). In light of our standard of review and the evidence in the record, that factual finding is supported and binding.

Second, the trial court also found as fact that it was more probable that the blood located on the left sleeve of defendant's jacket was deposited at the time of the murder rather than as a consequence of contamination. The trial court relied on Bell's and Kaplan's testimony, explaining that

> "[R]andom surface swabs were taken from the exterior of defendant's jacket, described as Exhibit 1.5, in which the DNA profiles obtained revealed a mixture of at least two contributors—deemed not to be inconsistent with the storage of the jacket with decedent's clothes or the handling of the items at trial. In contrast, the cuttings *** of the cotton fibers within the jacket *** where red stains appeared on the surface yielded genetic material *** consistent with [Jackson's] profile: [Ex] 1.1—the back left sleeve[.] Unlike the random swab of the surface of the jacket which revealed a mixture of at least two unidentified contributors, the testing of the sleeve *** yielded only a single source of DNA—a partial DNA profile matching that of [Jackson].

> "* * * * *

> "*** [T]he DNA profile [from the left elbow area] from a randomly selected individual matching the partial DNA profile is less than 1 in 10 billion in the Caucasian, Africa[n] America[n] and Hispanic populations.

> "It is the expert opinion of both *** Bell and *** Kaplan ***, while not ruling out the possibility of contamination, that it is more probable that the blood revealed from cutting from the left sleeve, Exhibit 1.1. ***, was deposited at the time of the murder."

The trial court's order points to the evidence in the record that supports its finding that it was more probable that the blood located on the left elbow and that returned Jackson's DNA was blood deposited at the time of the murder. Further, in relying on their testimony, the trial court found Bell and

Kaplan to be credible, and defendant does not argue that the trial court lacked a basis in the record to make that credibility determination and it is, therefore, also binding on appeal. *Gable v. State of Oregon*, 353 Or 750, 762-64, 305 P3d 85, *cert den*, 571 US 1030 (2013). Because the trial court's factual findings are supported by the record, the trial court did not err in finding that the results from the jacket were not exculpatory, or favorable, to defendant.[6]

B.   *DNA Results from the Boots*

We next turn to the boots. In arguing that the results are exculpatory, defendant similarly misconstrues the testing results and their effect on his case. In describing the testing before the trial court, Bell explained that she tested the boots by visually separating them into sections, swabbing those sections, and testing the swabs for a chemical reaction with phenolphthalein to indicate the presence or absence of blood. Bell noted that Carpenter had detected human blood on the top of the right boot in 1987. Bell's testing revealed presumptively positive results for blood on both boots. As relevant to this appeal, on the right boot, the positive results were located in the following areas: toe, medial side, and lateral side. As also relevant to this appeal, on the left boot, positive results appeared in the following areas: lateral side and medial side.

Kaplan explained the DNA testing of the boots by breaking the results into two categories. The first category included the testing results from four areas on the left and right boots (Ex 41.1, 41.2, 41.3, and 41.4). Kaplan explained that the DNA profiles from those four areas were "all low-level" and that "[t]wo of them appeared to be DNA mixtures of at least two contributors." Kaplan concluded:

---

[6] Even assuming that defendant's theory is correct that Jackson's DNA on Ex 1.1 of defendant's jacket was the result of contamination, we reject defendant's argument that the remaining results from the jacket that returned multiple, low-level DNA profiles are somehow favorable to defendant. Given Kaplan's and Bell's testimony, which the trial court credited, that contamination of the jacket after trial was possible, we do not see how the presence of multiple DNA profiles on the jacket would be favorable to, or tend to exculpate, defendant. At best, those results would be inconclusive. In any event, as explained below in the discussion of the boots, the presence of DNA from multiple contributors of an unknown identity would not be favorable to defendant even considering the factual context of this case.

"So, based on how little DNA was recovered and then the potential for DNA from multiple individuals to complicate the interpretation, the results from those items are inconclusive. No comparisons can be made, conclusions can be drawn based on those four areas of the boot."

The second category included the results from a single area, the medial side, on the left boot (Ex 41.5). The results returned a mixture of "at least two contributors," a minor and a major contributor. The major contributor matches the DNA of defendant. However, for the minor contributor, Kaplan was only able to obtain two pieces of genetic information out of a potential of 32, which Kaplan concluded was too low to make any scientifically reliable conclusions regarding identity. Kaplan explained:

"When it gets to that level, it is in a DNA range where, yes, there's absolutely genetic information there; yes, there are DNA types there. But because I can't make any assumptions about how many people are there, it's also in that range of high risk of false exclusion, high risk of false inclusion. We call it inconclusive. We can't draw any meaningful conclusions."

Kaplan also noted that those two DNA types are not types held by Jackson, but disputed defendant's assertion that that result affirmatively excluded Jackson as the minor contributor. Kaplan explained:

"It's sort of a scien[tific] distinction, right. There is information there. There are two DNA types there. That's the results. The results [are] also that those two DNA types are not held by *** Jackson. That's another result.

"But the conclusions that can be drawn from that, could *** Jackson have contributed DNA or not, we don't draw conclusions at that level of DNA because of the risks associated with those types of conclusions at that level."

Defendant argues that the results from the boots are exculpatory in a number of ways. In defendant's view, because the state asked the jury to draw the inference that the blood on the boots was Jackson's, the DNA results would be exculpatory if the results show that the blood "either did not belong to Jackson or belonged to somebody else," which rebuts the state's theory at trial. Defendant argues

that the evidence establishes both. He first contends that the evidence affirmatively excludes Jackson as a contributor because the two DNA types that Kaplan detected from the minor contributor of the medial side of the left boot are not DNA types that were also held by Jackson. Alternatively, defendant argues that, even if the results do not affirmatively exclude Jackson as a contributor, the results from the boots are exculpatory because there were multiple contributors of DNA on the boots, including defendant's, and none of them were identified to be Jackson. Thus, defendant continues, the results are favorable because they "cast[] doubt on the state's theory" that the blood on the boots was Jackson's.[7]

The state responds that the testing from the boots is not exculpatory, emphasizing that the first four samples tested yielded a mixture of DNA that was too low to make any comparisons or conclusions. Addressing Ex 41.5, the medial side of the left boot, the state argues that the genetic information of the minor contributor did not affirmatively exclude Jackson because, as Kaplan testified, the levels of DNA were too low and thus categorized as inconclusive. Finally, the state argues that, even if the results could be viewed as excluding Jackson, the results, in the context of the case, would still not be exculpatory.[8] Again, we agree with the state.

Kaplan testified that the results from the first category of swabs tested (Ex 41.1, 41.2, 41.3, and 41.4) were "inconclusive" because of the low-levels of DNA that were recovered and that she was unable to reach any conclusions regarding the identity of the DNA contributors. The DNA

_____

[7] At oral argument, defendant also asserted that, even if the DNA results are viewed as inconclusive because they returned no identifiable DNA profile, the results would still be helpful because they would allow him to argue to the jury that, even with DNA testing, the state cannot establish that the blood on the boots belonged to Jackson, which refuted the inference the state asked the jury to draw at trial. Even if there is some case in which inconclusive evidence could be considered favorable within the meaning of ORS 138.696—an issue we do not decide—we do not view the record as supporting a conclusion that the inconclusive evidence regarding the boots constitutes favorable evidence under the statute.

[8] The state also contends that defendant should be judicially estopped from arguing that the results were exculpatory and that, if the trial court erred, defendant invited the error. We reject those arguments without discussion.

results do not, as defendant alleges, affirmatively exclude Jackson as the source of the blood on the boots. Because Kaplan was unable to make *any* conclusions regarding identity, the blood on the boots may or may not have been Jackson's. In other words, the blood on the boots neither exculpates nor inculpates defendant—those results are, in Kaplan's words, inconclusive.

Moreover, for the second category, Ex 41.5, Kaplan testified that the DNA profile for the minor contributor was also "inconclusive" based on how little DNA was recovered. Kaplan specifically rejected defendant's argument that the results from Ex 41.5 affirmatively exclude Jackson as the contributor because the two pieces of genetic information that were obtained were not held by Jackson. In its written order, the trial court found as fact that the DNA results from the boots did not generate useable DNA profiles and that factual finding is, for all the reasons just explained, supported by the record and binding on appeal. Therefore, for the same reasons as previously noted, the results from the boots are not exculpatory.

For similar reasons, the presence of defendant's DNA and multiple unknown contributors on the boots does not, as defendant argues, undermine the state's theory at trial that the blood on the boots was Jackson's, making the results favorable. Assuming without deciding that "exculpatory" for purposes of ORS 138.696 means evidence that would allow defendant to undermine the state's theory at trial, the results in this case do not hold the impeachment value defendant assigns to them. At the time of trial, Carpenter could not identify whose blood was on the boots. And today, because the unknown DNA profiles on the boots may or may not be Jackson's, those results—like the blood evidence presented at the time of trial—still cannot be used to identify whether the blood on the boots is Jackson's. Thus, even considering the factual context of the case and the inference the state asked the jury to draw that the blood on the boots was Jackson's, the results are not favorable to defendant.

In sum, even applying defendant's definition of exculpatory under ORS 138.696, the trial court did not err in concluding that the results from the boots and jacket were

not exculpatory and, thus, did not err in denying defendant's motion for a new trial.

Affirmed.

# APPENDIX—ER 32



Ex 1 Front and back exterior of Nefstad's denim jacket